1  Richard M. Pachulski (CA Bar No. 90073)
   Malhar S. Pagay (CA Bar No. 189289)
2  Scotta E. McFarland (CA Bar No. 165391)
   Pachulski Stang Ziehl & Jones LLP
3  10100 Santa Monica Blvd., 11th Floor
   Los Angeles, California  90067
4  Telephone: 310/277-6910
   Facsimile:  310-201-0760
5  E-mail: rpachulski@pszjlaw.com
           mpagay@pszjlaw.com
6          smcfarland@pszjlaw.com

7  Special Counsel for R. Todd Neilson, Chapter 11 Trustee for
   Ezri Namvar and Proposed Special Counsel for Bundy Dimes,
8  LLC, Mission Real Associates, LLC and Bunwil Capital, LLC

9              **UNITED STATES BANKRUPTCY COURT**
10             **CENTRAL DISTRICT OF CALIFORNIA**
               **LOS ANGELES DIVISION**
11

12  In re:                              Case No. 2:08-bk-32349-BR
                                        Chapter 11
13  EZRI NAMVAR, an individual,
                                        Case No. 2:10-bk-22149-BR
14                                      Chapter 11
                          Debtor.
15                                      Case No. 2:10-bk-22370-BR
    In re                              Chapter 11
16  BUNDY DIMES, LLC,
                                        Case No. 2:10-bk-22153-BR
17                                      Chapter 11
                          Debtor.
18  In re                              **NOTICE OF JOINT MOTION AND JOINT MOTION OF
                                        DEBTORS AND CHAPTER 11 TRUSTEE FOR ORDER (A)
19  MISSION REAL ASSOCIATES, LLC,      APPROVING THE SALE OF THE LAND AND BUILDING
                                        LOCATED AT WILSHIRE BUNDY PLAZA FREE AND
20                                      CLEAR OF CERTAIN LIENS, CLAIMS, INTERESTS, AND
                          Debtor       ENCUMBRANCES; (B) AUTHORIZING DISTRIBUTION
21  In re                              OF THE SALE PROCEEDS TO THE TRUSTEE; (C)
                                        AUTHORIZING THE TRUSTEE TO PAY CERTAIN COSTS
22  BUNWIL CAPITAL, LLC,               OF SALE AND COMMISSION; (D) AUTHORIZING THE
                                        ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
23                                      LEASES; AND (E) GRANTING RELATED RELIEF;
                          Debtor       MEMORANDUM OF POINTS AND AUTHORITIES;
24                                      DECLARATIONS OF R. TODD NEILSON, LOUIS A.
                                        CICALESE AND BOB SAFAI IN SUPPORT THEREOF**

25                                      Date:      May 12, 2010
                                        Time:      10:00 a.m.
26                                      Place:     Courtroom 1668
                                                   255 E. Temple Street
27                                                 Los Angeles, CA  90012
                                        Judge:     The Honorable Barry Russell
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**TO:  THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF EZRI NAMVAR; COUNSEL FOR THE CHAPTER 11 TRUSTEE OF NAMCO CAPITAL GROUP, INC.; COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NAMCO CAPITAL GROUP, INC.; ALL PARTIES TO BE PROVIDED NOTICE PURSUANT TO THE COURT'S ORDER ESTABLISHING NOTICE PROCEDURES AND PERMITTING NOTICE ON INSURED DEPOSITORY INSTITUTIONS BY FIRST CLASS MAIL ENTERED IN THE EZRI NAMVAR CASE; ALL CREDITORS OF BUNDY DIMES, LLC; ALL CREDITORS OF BUNWIL CAPITAL, LLC; ALL CREDITORS OF MISSION REAL ASSOCIATES, LLC; AND ANY PARTIES ASSERTING LIENS, CLAIMS, INTERESTS, OR ENCUMBRANCES AGAINST THE PROPERTY TO BE SOLD, INCLUDING, BUT NOT LIMITED TO, THE TENANT IN COMMON OWNERS OF THE PROPERTY:**

**PLEASE TAKE NOTICE** that a hearing will be held on May 12, 2010, at 10:00 a.m., Pacific time, before the Honorable Barry Russell in Courtroom 1668, 255 East Temple Street, Los Angeles, California (the "Sale Hearing"), to consider the motion (the "Sale Motion") filed by R. Todd Neilson, Chapter 11 Trustee for Ezri Namvar ( the "Trustee"), Bundy Dimes, LLC, an above-captioned debtor and debtor in possession ("Bundy Dimes"), Bunwil Capital, LLC, an above captioned debtor and debtor in possession ("Bunwil"), and Mission Real Associates, LLC, an above-captioned debtor and debtor in possession, ("Mission Real," together with Bundy Dimes and Bunwil, the "Debtors," and the Debtors together with the Trustee, the "Sellers") for entry of an order (the "Sale Order"), pursuant to sections 105, 363 and 365 of the United States Bankruptcy Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (each a "Bankruptcy Rule," and collectively, the "Bankruptcy Rules"), and the Local Bankruptcy Rules, (a) authorizing and approving the sale of approximately 1.02 acres of land and the approximately 307,000 square foot, fourteen-story office building located at Wilshire Bundy Plaza, 12121 Wilshire Boulevard, Los Angeles, California, and any other improvements erected or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

located on the land (collectively, the "Real Property"),[1] any rights and appurtenances to the land, all

tangible personal property located on the Real Property, certain specified leases and miscellaneous

agreements affecting the Real Property, permits and licenses pertaining to the Real Property, and

certain warranties and loans (collectively, with the Real Property, the "Property")[2] to Wilshire

Bundy Investments, Inc. a Delaware corporation, 100 Wilshire Blvd., Suite 700, Santa Monica,

California (the "Proposed Purchaser"), or the successful bidder submitting the highest and best offer,

as selected by the Trustee (the "Successful Bidder"), as determined pursuant to the sale procedures

(the "Sale Procedures") approved by this Court in the *Order (a) Approving Sale Procedures and Bid*

*Protections, Including Break-Up Fee and Contingent Expense Reimbursement, in Connection With the Sale of*

*the Land and Building Located at Wilshire Bundy Plaza; (b) Scheduling an Auction and a Hearing to*

*Consider Approval of Sale; (c) Approving Notice of Auction and Hearing on Approval of Sale; (d) Approving*

*the Purchase and Sale Agreement With the Stalking Horse Bidder; (e) Approving the Procedures for the*

*Assumption and Assignment of Leases and Contracts; and (f) Granting Related Relief* (the "Sale Procedures

Order"), free and clear of all liens, claims, interests, rights of first refusal or first offer or other rights

(including, without limitation, the interests of all co-owners), and encumbrances, except for the liens

securing the Assumable Loans (defined below), non-delinquent real estate taxes and other

assessments, and the other Permitted Exceptions as described and defined in the PSA, (collectively,

the "Liens" and individually, a "Lien"), with any such Liens to attach to the net proceeds of the sale

with the same validity and priority as existed prior to the sale; (b) approving the assumption and

assignment of the Sellers' interests in the unexpired leases[3] and executory contracts (each a

"Selected Contract or Lease" and together, the "Selected Contracts and Leases") listed on Schedules

1(e) and 1(f) to the PSA (defined below) attached hereto as **Exhibit "1"**; (c) authorizing the

distribution of the proceeds of the sale to the Trustee; (d) authorizing the Trustee to pay, at closing of

the sale from the proceeds of the sale, the closing costs of the sale that are to be paid by Sellers

pursuant to the PSA (defined below), including, but not limited to, the commission due to the broker,

---

[1] The Real Property is the property that is the subject of the *Order re: Trustee's Motion to Approve Agreement re: Sale and Lease of Real Property and Employment of Broker* entered on November 11, 2009 (Docket No. 379) ("Sale Agreement and Broker Employment Order").
[2] Please refer to **Exhibit "1"** attached hereto for a more complete description of the Property.
[3] Most of the leases to be assumed are the tenant leases.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Madison Partners; and (e) granting related relief.

2      **PLEASE TAKE NOTICE** that pursuant to the Sale Agreement and Broker Employment

3  Order, the Property Owners and the Trustee employed Madison Partners as the real estate broker and

4  leasing agent for the Property.  Madison Partners has marketed the Property extensively for four

5  months, sending information regarding its availability to over 25,000 prospects, including 1,200

6  local investors.  Additionally, on November 16, 2009, the Property was featured in the *Los Angeles*

7  *Business Journal*'s Real Estate section, ensuring the Property's exposure to the publication's

8  circulation of 30,000 and readership of over 80,000.  As of February 22, 2010, 379 interested parties

9  have executed non-disclosure agreements in order to obtain information regarding the Property.

10  Madison Partners has established a data room that contains information about the Property in which

11  a potential purchaser would be interested.  Also as of February 22, 2010, Madison Partners had

12  conducted 59 tours of the Property and given 83 parties access to a data room regarding the Property.

13      **PLEASE TAKE FURTHER NOTICE** that, after extensive negotiations with various

14  interested parties, the Trustee, Bundy Dimes and Mission Real selected the offer of Wilshire Bundy

15  Investments, Inc., the Proposed Purchaser, located at 100 Wilshire Blvd., Suite 700, Santa Monica,

16  California, as the Stalking Horse Bid, and entered into the Purchase and Sale Agreement (the

17  "PSA"), attached hereto as **Exhibit "1"** with the Proposed Purchaser as of March 16, 2010.

18      **PLEASE TAKE FURTHER NOTICE** that the Purchase Price set forth in Section 2 of the

19  PSA is $99.5 million, subject to adjustments and prorations as provided in Section 8 of the PSA.

20  Such amount includes the assumption of the Assumption Amount, as defined in the PSA, in the

21  approximate amount of $66.9 million.  Closing of the sale of the Property is conditioned on, among

22  other things, the following:

23      (a)      the issuance of an ALTA extended coverage owner's title insurance policy to

24          the Proposed Purchaser and its permitted assignees as set forth in section

25          6.1(b) of the PSA;

26      (b)      the Lenders' approval of the Proposed Purchaser's and its permitted

27          assignees' assumption of the each of the Assumable Loans (defined below)

28          and Proposed Purchaser's and its permitted assignees' assumption of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Assumable Loans in accordance with the provisions of Section 6.1(c) and

2   6.2(c) of the PSA;

3   (c)   the Sale Procedures Order having been entered in the chapter 11 cases of

4   Bundy Dimes and Mission Real;

5   (d)   the Bankruptcy Court having entered the Sale Order and the Sale Order not

6   having been stayed and remaining in full force and effect as of the Closing (as

7   defined in the PSA); and

8   (e)   the Proposed Purchaser shall have deposited into escrow the cash portion of

9   the Purchase Price and all other monies required to be deposited by the

10   Proposed Purchaser as required by the PSA, subject to adjustment for any

11   prorations and credits provided under the PSA.

12   **PLEASE TAKE FURTHER NOTICE** that the sale is intended to be free and clear of all

13   Liens, including, without limitation, the liens, claims, interests, rights and encumbrances described

14   on **Exhibit "2"** attached hereto and any and all other liens, claims, interests, rights and

15   encumbrances allegedly held by any party, including the ownership interests of the non-Debtor co-

16   owners of the Property and any party asserting any right of first refusal or first offer with respect to

17   the Property or any other rights, except for the liens securing the Assumed Amount and the other

18   Permitted Exceptions identified in Section 6.1(b) of the PSA.

19   **PLEASE TAKE FURTHER NOTICE** that the sale is subject to higher and better bids.  An

20   auction of the Property will be held on May 11, 2010, beginning at 10:00 a.m. (Pacific time) in the

21   offices of Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 11th Floor, Los Angeles,

22   California, or at such other location identified by the Trustee to the Qualified Bidders.  Please see the

23   Sale Procedures that have been approved by the Court and have been served on all interested parties

24   along with this Motion for the procedures that apply to submitting a Qualified Bid and bidding at the

25   Auction.

26   **PLEASE TAKE FURTHER NOTICE** that the estimated costs of the sale of the Property

27   are attached hereto as **Exhibit "3"**.  The commission for the broker, Madison Partners, is a one

28   percent (1%) commission.  It is estimated that, after all prorations and other adjustments and

payment of closing costs, approximately $27 to $30 million will be available for the Trustee to hold in a segregated account pending the resolution of any disputes over entitlement to the proceeds.

**PLEASE TAKE FURTHER NOTICE** that the tax consequences of the sale to the estates of Ezri Namvar, Bundy Dimes, Bunwil Capital and Mission Real are discussed below in the attached Memorandum of Points and Authorities.

**PLEASE TAKE FURTHER NOTICE** that this Motion is based on the Declarations of Bob Safai, R. Todd Neilson, and Louis A. Cicalese filed concurrently herewith, the supporting Memorandum of Points and Authorities, the statements, arguments and representations of counsel who appear at the hearing regarding the Motion, the record in these cases, any other evidence properly before the Court prior to or at the Sale Hearing, and all matters of which this Court may property take judicial notice.

**PLEASE TAKE FURTHER NOTICE** that the Sale Procedures Order requires that any responses or objections to this Sale Motion must be filed with the Court and served so that it is received by counsel for the Trustee by no later than **April 28, 2010**.  Pursuant to Local Bankruptcy Rule 9013-1(h), the failure to timely file and serve written opposition may be deemed by the Court to be consent to the granting of the relief requested in the Sale Motion.

**WHEREFORE**, the Sellers respectfully request that the Court enter an order: (a) approving the sale of the Property to the Proposed Purchaser or the Successful Bidder, free and clear of all Liens (including the interests of the non-Debtor Property Owners and any parties claiming rights in respect of the Property, including, without limitation, any right of first refusal or first offer), with any such Liens to attach to the proceeds of the sale with the same validity and priority as existed prior to the sale; (b) finding that the Proposed Purchaser or the Successful Bidder is a good-faith purchaser under section 363(m) of the Bankruptcy Code; (c) authorizing the sale proceeds to be distributed to the Trustee; (d) authorizing the Trustee to pay, at closing from the proceeds of the sale, the closing costs of the sale that are to be paid by Sellers pursuant to the PSA, including, but not limited to, the commission due to the broker, Madison Partners; (e) approving the assumption and assignment of the Selected Contracts and Leases; and (e) granting such other and further relief as is just and proper under the circumstances.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Dated:    April 8, 2010                    PACHULSKI STANG ZIEHL & JONES LLP

By    _/s/ Malhar S. Pagay_
        Richard M. Pachulski (CA Bar No. 90073)
        Malhar S. Pagay (CA Bar No. 189289)
        Scotta E. McFarland (CA Bar No. 165391)

        Special Counsel for Chapter 11 Trustee for
        Ezri Namvar and Proposed Special
        Counsel to Bundy Dimes, LLC, Bunwil
        Capital, LLC and Mission Real, LLC,
        Debtors and Debtors in Possession

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ................................................................................................. 8
II. STATEMENT OF FACTS ..................................................................................... 8
    A.  Jurisdiction and Venue ............................................................................... 8
    B.  The Namvar Chapter 11 Case ..................................................................... 8
    C.  Brief Business History of Ezri Namvar ....................................................... 9
    D.  The Bundy Dimes, Bunwil, and Mission Real Chapter 11 Cases ............... 10
    E.  Ownership Structure of Bundy Dimes, Bunwil and Mission Real .............. 10
    F.  Description of the Property and Its Ownership ........................................... 10
    G.  Description of Current Financing of the Property ...................................... 11
    H.  The Timing of the Sale of the Property ..................................................... 12
    I.   The Marketing of the Property ................................................................. 14
    J.  The Agreement With the Proposed Purchaser ............................................ 14
         1.  Purchase Price .................................................................................. 15
         2.  Assets. 15
         3.  Assumed Obligations ........................................................................ 15
         4.  Additional Contracts to Be Assumed and Assigned ........................... 15
         5.  Certain Conditions to Closing.  Closing of the sale of the Property is
             conditioned on, among other things, the following: ............................. 16
         6.  Closing. .......................................................................................... 16
    K.  The Approval of the Sale Procedures ......................................................... 16
    L.  The Property Owners' Agreement Regarding the Sale of the Property ......... 17
    M.  Disbursement of the Proceeds of the Sale .................................................. 18
    N.  Tax Consequences to the Sellers of the Sale .............................................. 19
III. RELIEF REQUESTED ...................................................................................... 20
IV. ARGUMENT ..................................................................................................... 20
    A.  Cause Exists to Approve the Sale of the Property Under Section 363(**b**) of the
        Bankruptcy Code .................................................................................... 20
         1.  Consideration to Be Paid ................................................................... 21
         2.  The Financial Condition and the Needs of the Sellers ....................... 22
         3.  The Qualifications of the Buyer ........................................................ 22
         4.  Risk of Decline in Value of the Property .......................................... 22
    B.  Sale of the Property Free and Clear of Liens, Claims, Interests, and
        Encumbrances Pursuant to 11 U.S.C. § 363(**f**) ........................................... 23
         1.  Parties Asserting Interests in the Property Consent to the Sale (11 U.S.C.
             §363(f)(2)) ...................................................................................... 24
         2.  Purchase Price Exceeds Lien Amounts (11 U.S.C. §363(f)(3)) ............ 24
         3.  Property May Be Sold Free and Clear of Interests in Bona Fide Dispute
             (11 U.S.C. §363(f)(4)) ...................................................................... 25
         4.  Parties Asserting Interests in the Property Could Be Compelled to Accept
             a Money Satisfaction (11 U.S.C. §363(f)(5)) ...................................... 26
    C.  The Sale Will Be Made in Good Faith Under Section 363(m) of the Bankruptcy
        Code ....................................................................................................... 27
    D.  The Proceeds of the Sale Should Be Distributed to the Trustee and the Trustee
        Should Be Authorized to Pay the Sellers Closing Costs ............................. 28
    E.  Cause Exists to Approve the Assumption and Assignment of the Selected
        Contracts and Leases ............................................................................... 29
    F.  Notice of the Sale ................................................................................... 31
    G.  Request for Waiver of Rule 6004(**h**) Stay ................................................... 33
V.  CONCLUSION ................................................................................................. 34

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Abbotts Dairies of Pennsylvania, Inc.*,
  788 F. 2d 143 (3rd Cir. 1986) ........................................................................... 27

*In re Bel Air Asocs., Ltd.*,
  706 F. 2d 301 (10th Cir. 1983) ....................................................................... 27

*In re Canyon P'ship*,
  55 B.R. 520 (Bankr. S.D. Cal. 1985) ............................................................. 21

*In re Channel One Commc'ns, Inc.*,
  117 B.R. 493 (Bankr. E.D. Mo. 1990) ........................................................... 24

*In re Chipwich Inc.*,
  54 B.R. 427 (Bankr. S.D. N.Y. 1985) ............................................................ 29

*Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*,
  94 B.R. 343 (E.D. Pa. 1988) ........................................................................... 23

*Clear Channel v. Knupfer*,
  391 B.R. 25 (B.A.P. 9th Cir. 2008) ................................................................ 24

*Clear Channel*,
  391 B.R. at 45-46 ....................................................................... 24, 26, 27

*In re Continental Airlines, Inc.*,
  780 F.2d 1223 (5th Cir. 1986) ........................................................................ 21

*Elliott v. Four Seasons Properties (In re Frontier Properties, Inc.)*,
  979 F.2d 1358 (9th Cir. 1992) ........................................................................ 31

*Equity Funding Corp. of Am. v. Fin. Assocs. (In re Equity Funding Corp.)*,
  492 F.2d 793 (9th Cir. 1974) .......................................................................... 21

*Ewell v. Diebert (In re Ewell)*,
  958 F.2d 276 (9th Cir. 1992) .......................................................................... 27

*In re FCX, Inc.*,
  60 B.R. 405 (Bankr. E.D. N.C. 1986) ............................................................ 29

*In re Friedel*,
  324 B.R. 138 (Bankr. M. D. Ala. 2004) ......................................................... 24

*Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. Co.*,
  318 U.S. 523 (1943) ........................................................................................ 29

*Herman Inv. Co. v. Loeffler*,
  419 U.S. 964 (1974) ........................................................................................ 21

*In re Hunt Energy Co., Inc.*,
  48 B.R. 472 (Bankr. N.D. Ohio 1985) ........................................................... 27

*In re Lafayette Radio Electronics Corp.*,
  9 B.R. 993 (Bankr. E.D. N.Y. 1981) .............................................................. 31

*In re Moore*,
  110 B.R. 924 (Bankr. C.D. Cal. 1990) ........................................................... 20

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306, 70 S. Ct. 652, 94 L. Ed. 865 (1950) ....................................... 33

*In re Red Oak Farms, Inc.*,
  36 B.R. 856 (Bankr. W.D. Mo. 1984) ............................................................ 27

*Richmond Leasing Co. v. Capital Bank, N.A.*,
  762 F.2d 1303 (5th Cir. 1982) ........................................................................ 29

*Robertson v. Pierce (In re Chi-Feng Huang)*,
  23 B.R. 798 (BAP 9th Cir. 1982) ................................................................... 29

*In re Sasson Jeans, Inc.*,
  90 B.R. 608 (S.D. N.Y. 1988) ........................................................................ 27

*Sea Harvest Corp. v. Riviera Land Co.*,
  868 F.2d 1077 (9th Cir. 1989) ........................................................................ 31

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

i

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*Stephens Indus. V. McClung*,
  789 F. Ed 386 (6th Cir. 1986) ........................................................................................ 21
*Summit Land Co. v. Allen (In re Summit Land Co.)*,
  13 B.R. 310 (Bankr. D. Utah 1981) ............................................................................. 29
*In re Terrace Chalet Apartments, Ltd.*,
  159 B.R. 821 (N.D. Ill. 1993) ....................................................................................... 26
*Veltman v. Whetzal*,
  93 F.3d 517 (8th Cir. 1996) ........................................................................................... 24
*Walter v. Sunwest Bank (In re Walter)*,
  83 B.R. 14 (B.A.P. 9th Cir. 1988) ................................................................................ 21
*In re Weyland*,
  63 B.R. 854 (Bankr. E.D. Wisc. 1986) ......................................................................... 27

**Statutes**
11 U.S.C. § 102(1)(A) ..................................................................................................... 32
11 U.S.C. § 105(a) ........................................................................................................... 20
11 U.S.C. § 363(b)(1) ...................................................................................................... 20
11 U.S.C. § 363(**f**) ........................................................................................... 23, 24, 26
11 U.S.C. § 363(f)(3) ....................................................................................................... 24
11 U.S.C. § 363(f)(2) ....................................................................................................... 24
11 U.S.C. § 363(f)(4) ....................................................................................................... 25
11 U.S.C. § 363(f)(5) ....................................................................................................... 26
11 U.S.C. § 363(h) ........................................................................................................... 18
11 U.S.C. § 365(a) ........................................................................................................... 29
11 U.S.C. § 365(b) ........................................................................................................... 30
11 U.S.C. § 365(f)(1) ....................................................................................................... 30
11 U.S.C. § 365(f)(2) ....................................................................................................... 30
28 U.S.C. § 157 .................................................................................................................. 8
28 U.S.C. § 1334 ................................................................................................................ 8
28 U.S.C. § 1408 ................................................................................................................ 8
28 U.S.C. § 1409 ................................................................................................................ 8
28 U.S.C. § 157(b)(2) ........................................................................................................ 8
California Civil Code § 2924k ......................................................................................... 26

**Other Authorities**
10 *Collier on Bankruptcy*,
  ¶ 6064.09 (L. King, 15th rev. ed.) ................................................................................. 33

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.
### <u>INTRODUCTION</u>

The building and land located at Wilshire Bundy Plaza have been actively marketed for four months.  As a result of the marketing efforts of the Trustee, as of January 15, 2010, an unprecedented 379 expressions of interest and 41 offers to purchase the Property have been received, 17 of which exceed $90 million.  After extensive negotiations with various parties, the Trustee selected the $99,500,000 bid of Wilshire Bundy Investments, Inc. as the Stalking Horse Bid.  The Sellers have filed this *Joint Motion of Debtors and Chapter 11 Trustee for Order (a) Approving the Sale of the Land and Building Located at Wilshire Bundy Plaza Free and Clear of All Liens, Claims, Interests, and Encumbrances; (b) Authorizing the Disbursement of Proceeds of Sale; (c) Authorizing the Assumption and Assignment of Contracts and Leases; (d) Granting Related Relief* (the "Sale Motion"), because they determined that the sale of the Property in accordance with the Sale Procedures to the Proposed Purchaser or the Successful Bidder will maximize the value of the Property for the benefit of their estates and creditors.

### II.
### <u>STATEMENT OF FACTS</u>

**A.    <u>Jurisdiction and Venue</u>**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The venue of these cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**B.    <u>The Namvar Chapter 11 Case</u>**

The bankruptcy case of Ezri Namvar ("Namvar") was commenced on December 22, 2008 (the "Namvar Petition Date"), when petitioning creditors of Namvar filed an involuntary petition for relief under chapter 11 of the Bankruptcy Code.

Namvar consented to the entry of order for relief and on or about January 29, 2009, and the order for relief was entered (Docket No. 55).

On February 27, 2009, the Court entered its *Order Directing the Appointment of a Chapter*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    *11 Trustee* (Docket No. 94).

2    On March 11, 2009, the Court entered the order approving the appointment of the Trustee

3    (Docket No. 106).

4    **C.    Brief Business History of Ezri Namvar**

5    Prior to the Namvar Petition Date, Namco Capital Group, Inc. ("Namco"),[4] a corporation of

6    which Namvar was an officer and sole shareholder, had been in business for approximately 20 years.

7    Until approximately 2005, Namco's business model was relatively simple and straightforward -

8    Namco would borrow money from individuals ("Lender Funds"), most often members of the West

9    Los Angeles Persian community (hereinafter referred to as a "Lender"), agree to pay such Lender a

10    fixed rate of return, and then lend those funds to third parties (hereinafter a "Borrower"), at interest

11    rates typically six percent or more higher than the cost of capital payable to the Lender.  Most often,

12    the funds provided by the Lenders were not earmarked for a specific purpose; rather, such funds

13    were pooled by Namco and lent to third parties as opportunities were presented.  Typically, the

14    transactions between Namco and a Lender would be memorialized by way of an unsecured

15    promissory note from Namco to the Lender ("Note" or "Notes"), although, in some cases, Namco

16    secured or attempted to secure the Notes in various ways, typically by assigning interests in third

17    party deeds of trust owned by Namco or affiliates of Namco.  Namvar purportedly personally

18    guaranteed many of Namco's obligations to the Lenders.  So long as a Note was outstanding, Namco

19    typically paid such Lender interest on a monthly basis.  The loans that Namco made to Borrowers

20    were typically real estate loans secured by deeds of trust.  Namco was generally known during this

21    time period as a "hard money lender."

22    Beginning in approximately 2002, Namco's business changed.  For the most part, from this

23    point forward, instead of using the Lender Funds to make secured loans against real estate owned by

24    third parties, Namvar began using the Lender Funds to purchase and develop real estate for his own

25    account or for the account of Namco or an affiliate.  While Namco, Namvar, or an affiliate acquired

26    some property in its own right, the more typical model was a joint venture with a real estate

---

[4] On December 22, 2008, the petitioning creditors of Namco filed an involuntary petition for relief under Chapter 11. Namco consented to the entry of an order for relief and on January 29, 2009, the Court entered the order for relief.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

developer.  To date, the Trustee, Namvar and Namco professionals have located hundreds of limited liability companies in which Namco, Namvar, or an affiliate had an interest.  In fact, some investments appear to have been booked through one or more affiliates of Namco, which members of the Namvar family (usually Namvar's minor children or his adult siblings) owned (the "Namvar LLCs").  Where such investments were not booked through Namco, but rather through Namvar LLCs, Namco's records reflect these advances as loans from Namco to the Namvar LLCs.  Even though, in many cases, Namco was the original source of the funds used for the capital investments, Namco never received any part of the LLC consideration.  Rather, the consideration was booked in the name of the Namvar LLCs.  All told, it appears that Namco or an affiliate invested in more than 300 real estate LLCs.

**D.    The Bundy Dimes, Bunwil, and Mission Real Chapter 11 Cases**

On March 31, 2010, Bundy Dimes, Bunwil and Mission Real filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in any of the Debtors' chapter 11 cases.

**E.    Ownership Structure of Bundy Dimes, Bunwil and Mission Real**

The sole member of Bundy Dimes is Dimes, LLC.  An involuntary chapter 7 petition was filed against Dimes, LLC on June 19, 2009.  As of this date, no order for relief has been entered in that case.  The Namvar estate owns a 50% membership interest in Dimes, LLC and Namvar is the custodian for his three children who hold the remaining 50% interest in Dimes, LLC.

Bunwil Capital is owned 100% by WN Birdview, LLC.  The documentation available with respect to WN Birdview, LLC shows that it is owned 100% by Dimes.

The Namvar estate owns a 92.5% interest in Mission Real.  The remaining 7.5% of Mission Real is owned by Homayon "Tony" Namvar, Namvar's brother.

**F.    Description of the Property and Its Ownership**

The Property, situated on the northwest corner of Wilshire Boulevard and Bundy Drive in the Brentwood District of Los Angeles, is comprised of approximately 1.02 acres of land and a Class A,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

fourteen-story office building with more than 307,000 square fee of office space.  As of March 25, 2010, the office building was 84% occupied.

The Sellers have determined that the fee interest in one of the parcels comprising the land portion of the Property is owned by three limited liability companies as tenants in common:  Bundy Dimes, which owns a 67% interest in the land; Bunherst, LLC, which owns an 18% interest; and Tribun, LLC, which owns a 15% interest (collectively, the "Land Owners").[5]  The Land Owners lease this portion of the land, pursuant to a ground lease, to five limited liability companies that own the improvements and the fee interest in the other parcels which comprise the land portion of the Property: Civic Palm, LLC, which owns a 17.3% interest in the improvements; Mission Real, which owns a 52.3% interest; Wilbun 7, LLC, which owns a 14.7% interest; Wilshire Bundy Holdings, LLC, which owns a 15.7% interest; and Bunwil Capital, which owns a 1% interest (collectively, the "Building Owners" and together with the Land Owners, the "Property Owners" and, individually, each a "Property Owner").[6]

**G.    Description of Current Financing of the Property**

There are currently two consensual liens against the Property securing two loans.  The first, in the original principal amount of $60,300,000, is held by Wells Fargo Bank, N.A., as trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2006-LDP7 ("Wells Fargo"), and the second, in the original principal amount of $10,000,000, is held by American General Life and Accident Insurance Company, a Tennessee corporation ("American General" and collectively with Wells Fargo, the "Assumable Financing Lenders").  The approximate aggregate amount owed the Assumable Financing Lenders as of March 25, 2010, is $66.9 million (the "Assumable Loans")  The financing provided by the Assumable Financing Lenders must be assumed by a purchaser, subject to the approval of the Assumable Financing Lenders.

---

[5] Namvar does not have a membership interest in either Bunherst, LLC or Tribun, LLC.
[6] Namvar, along with his children for whom he serves as custodian, holds 100% of the membership interests in Civic Palm, LLC.  Namvar, through ownership interests in various other limited liability companies, indirectly owns a substantial interest in each of the other Building Owners.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**H.**     **The Timing of the Sale of the Property**

The Sellers, in consultation with their advisors and professionals, have considered numerous factors relating to the timing of the marketing and sale of the Property.  One consideration has been the leasing market.  Due to the continued slow national economy and the resulting contraction of business activity, the commercial leasing market has suffered and continues to do so.  Los Angeles has not escaped the effects of the sluggish economy and has experienced an increase in commercial office vacancy rates over the last two years.  According to both CB Richard Ellis and Cushman Wakefield, vacancy rates on the Westside of Los Angeles have increased from 10% three years ago to 14.5% today.  There is no indication that this downward trend will be reversed in the near future.

The Property, like other assets in the marketplace, has felt the effects of the overall economy.  It has experienced a turnover of tenants and a downward trend in rental rates.  In 2006, the average annual rental rates paid at the Property were approximately $4.00 per square foot.  Today, they are $3.00 per square foot on average with new tenants refusing to pay rental rates that landlords were demanding and receiving six to eight months ago.  Indicative of the new tenants that are looking at the Property, a recent lease proposal received was for thirty-five percent (35%) below the Property's quoted rental rate, with $25 per square foot in tenant improvements demanded.

In addition to the reduced rental rate structure, the Property managers, like other landlords on the Westside and nationally, have had to offer tenants concessions and enhanced tenant improvement packages in an effort to renew existing tenants and attract new tenants.  For example, in the recent renegotiation of five leases of space in the Property, two tenants substantially reduced the square footage being leased and four of the tenants were granted several months of free rent.  In other situations, negotiations with tenants have resulted in unused tenant improvement allowances being utilized to satisfy arrearages or future rental obligations.  These factors have resulted in an overall decline in the monthly rentals received.  Moreover, the need to provide concessions and improvement packages in order to attract and retain tenants requires a dependable and sufficient income stream and adequate capitalization.

All of these factors contribute to an unstable environment in which the maintenance of operating income sufficient to meet debt service and the Property's value on a long-term basis may

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California

1   be challenged.  In fact, the ability of the Property to generate sufficient revenues on a stand alone

2   basis to meet its obligations during the pendency of the Namvar chapter 11 case thus far has been

3   uncertain.  It also appears likely that this uncertain environment may continue for at least the next

4   three years:  The financial advisor to the Official Committee of Unsecured Creditors of Namco

5   Capital Group stated three months ago that there is "an enormous amount of commercial real estate

6   debt coming due between now and 2013" leading to a "crisis of maturity" where "loans will mature

7   and there won't be new funding to refinance."  Beaudette, M., "Defaults, Bankruptcies Expected to

8   Fall After Extraordinary Year", Dow Jones Daily Bankruptcy Review (January 4, 2010) (quoting M.

9   Freddie Reiss, FTI Consulting, Inc.).  It is, therefore, extremely important that the owner of the

10  Property be sufficiently capitalized to meet the demands related to tenant concessions in order to

11  compete in this commercial leasing market, to continue to meet operating expenses and to service

12  the debt on the Property.  The Sellers do not believe that Property Owners are in a financial position

13  to meet those demands.  Thus, a risk exists that the Property could decline in value if left in the

14  possession of the bankruptcy estates.

15      Also, based on purchase offers received over the last three years, it appears that the Property

16  has experienced a decline in value.  In April, 2007, an off-market offer was received for

17  $165,000,000.  In October, 2007 and April, 2008, offers for $180,000,000 and $157,000,000,

18  respectively, were received.  The Property was put on the market and offers solicited in August,

19  2008.  At that time, twelve offers were received ranging in value from $120,000,000 to

20  $142,500,000.  Throughout this three year period, the Property Owners failed to close a sale,

21  choosing instead to hold on to the Property, apparently hoping for a dramatic increase in its value.

22  However, as is demonstrated by the offers received by the Sellers, over a year and a half after the

23  August, 2008 offers were received, that rebound has yet to take place.  Further, based on the general

24  economic conditions and the trend in occupancy and rental rates, it is uncertain if or when it might

25  take place.

26      The Sellers believe that the Trustee received several very favorable offers for the Property

27  that represent a "scarcity premium" due to the timing of the marketing of the Property by the Trustee

28  - a time when a scarcity of available Class A high rise office buildings exists on the market.  Of all

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

the offers received thus far, the Stalking Horse Bid of the Proposed Purchaser is the highest and best.

However, the sheer number of offers received and number of other parties expressing an interest in

the Property, the momentum that has already developed in pursuing a transaction and the favorable

circumstances to sell the Property in this environment at the highest and best price, strongly indicate

that there will be overbids at the auction of the Property.  Although no one can predict the future,

based on all of the indicators discussed above, both near-term and long-term uncertainty, and the

results of the Trustee's marketing efforts, the Sellers assert that it is in the best interests of the

Namvar estate and the Debtors respective estates to sell the Property now.

**I.       The Marketing of the Property**

Pursuant to the Sale Agreement and Broker Employment Order (defined below), the Trustee

and the Property Owners employed Madison Partners as the real estate broker and leasing agent for

the Property.  Madison has marketed the Property extensively for four months, sending information

regarding its availability to over 25,000 prospects, including 1,200 local investors.  Additionally, on

November 16, 2009, the Property was featured in the *Los Angeles Business Journal*'s Real Estate

section, ensuring the Property's exposure to the publication's circulation of 30,000 and readership of

over 80,000.  As of February 22, 2010, 379 interested parties have executed non-disclosure

agreements in order to obtain information regarding the Property.  Madison Partners has established

a data room that contains information about the Property in which a potential purchaser would be

interested.  Also as of February 22, 2010, Madison Partners has conducted 59 tours of the Property

and given 83 parties access to a data room regarding the Property.

The results of the marketing efforts have been unprecedented:  The Trustee has received

forty-one (41) offers to purchase the Property.  Seventeen (17) parties submitted offers in excess of

$90 million and the Trustee entered into negotiations with those parties.  The offer of Wilshire

Bundy Investments, Inc., the Proposed Purchaser, was eventually selected as the stalking horse bid.

**J.       The Agreement With the Proposed Purchaser**

The Sellers ultimately concluded that the sale of the Property to the Proposed Purchaser,

subject to the opportunity for parties to submit overbids, would maximize value for the Sellers'

estates.  On March 17, 2010, after extensive negotiations, the Trustee, Bundy Dimes and Mission

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Real entered into the PSA with the Proposed Purchaser.  A copy of the PSA, is attached hereto as **Exhibit "1"**.  Pursuant to the terms of the PSA, the Proposed Purchaser, subject to (1) the submission of higher and better offers and (2) Court approval of the sale, will purchase the Property and accept the assignment of the Selected Contracts and Leases.

The terms of the Proposed Purchaser's offer to purchase the Property are set forth in full in the PSA and are summarized below.  The description below only summarizes certain provisions of the PSA, and the terms of the PSA control in the event of any inconsistency.

**1.      Purchase Price.**  The total purchase price for the Property will be $99,500,000, subject to prorations and adjustment pursuant to Article 8 of the PSA (the "Purchase Price").  The Purchase Price includes the Assumption Amount, as defined in the PSA, in the approximate amount of $66.9 million.

**2.      Assets.**  The assets subject to the PSA are (a) the real property commonly known as Wilshire Bundy Plaza at 12121 Wilshire Boulevard, Los Angeles, California (the "Land"); (b) the buildings, structures and improvements erected and located on such land (the "Improvements" and together with the Land, the "Real Property"); (c) any rights and appurtenances pertaining to the Land; (d) all tangible personal property located on the Real Property; (e) the Sellers' interests in all Selected Contracts and Leases listed on Schedule 1.3 and Schedule 1.4 of the PSA; (f) assignable intangible property used exclusively in connection with the Real Property; (g) all assignable warranties of any contractor, manufacturer or materialman that relates to the Improvements or the personal property being sold; (h) the Sellers' interests in the Ground Lease (as defined in the PSA); and (i) the Sellers' interest in the Wells Fargo and American General loans and loan documents (as further identified in the PSA).

**3.      Assumed Obligations.**  The Wells Fargo loan in the original principal amount of $60,030,000.00 (and a current, outstanding principal balance of approximately $57 million) and the American General loan in the original principal amount of $10,000,000.00 (and a current, outstanding principal balance of approximately that same amount).

**4.      Additional Contracts to Be Assumed and Assigned.**

The Sellers shall assume and assign the Selected Contracts and Leases to which they are

1    parties, pursuant to section 365 of the Bankruptcy Code.

2    **5.    Certain Conditions to Closing.  Closing of the sale of the Property is conditioned**

3    **on, among other things, the following:**

4    (f)    the issuance of an ALTA extended coverage owner's title insurance policy as

5    set forth in section 6.1(b) of the PSA;

6    (g)    the Lenders' approval of the Proposed Purchaser's assumptions of the loans

7    and a commitment to deliver an assumption agreement and related documents;

8    (h)    the Sale Procedures Order shall be ratified in the chapter 11 cases of Bundy

9    Dimes and Mission Real;

10    (i)    the Bankruptcy Court shall have entered an order approving the Sale Order

11    and the Sale Order shall not be stayed and shall be in full force and effect; and

12    (j)    the Proposed Purchaser shall have deposited into escrow the cash portion of

13    the Purchase Price and all other monies required to be deposited by the

14    Proposed Purchaser as required by the PSA, subject to adjustment for any

15    prorations and credits provided under the PSA.

16    **6.    Closing.**  The Closing of the sale shall take place two (2) business days after the entry

17    of the Sale Order by the Bankruptcy Court but in no event later than **September 1, 2010**, except as

18    may be extended by agreement of the parties.

19    The Sellers believe that the sale of the Property to the Proposed Purchaser or Successful

20    Bidder determined in accordance with the Sale Procedures will result in the highest and best price

21    for the Property.

22    **K.    The Approval of the Sale Procedures**

23    On March 18, 2010, the Trustee filed the *Motion of Chapter 11 Trustee for Order (a)*

24    *Approving Sale Procedures and Bid Protections, Including Break-Up Fee and Contingent Expense*

25    *Reimbursement, in Connection With the Sale of the Land and Building Located at Wilshire Bundy*

26    *Plaza; (b) Scheduling an Auction and a Hearing to Consider Approval of Sale; (c) Approving Notice*

27    *of Auction and Hearing on Approval of Sale; (d) Approving the Purchase and Sale Agreement With*

28    *the Stalking Horse Bidder; (e) Approving the Procedures for the Assumption and Assignment of*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*Leases and Contracts; and (f) Granting Related Relief* (the "Sale Procedures Motion"), concurrently with a motion requesting shortened notice ("Motion to Shorten Notice") for the hearing on the Sale Procedures Motion.  The Court granted the Motion to Shorten Notice and set the hearing regarding the Sale Procedures Motion for March 31, 2010 (the "Sale Procedures Hearing").  Burnherst, LLC (one of the Property Owners), the Official Committee of Unsecured Creditors of Namco (the "Namco Committee") joined by the Official Committee of Unsecured Creditors in this case, and George Haroonian on behalf of himself and other creditors of the Namco and Namvar estates filed oppositions to the Sale Procedures Motion.

On March 31, 2010, prior to the Sale Procedures Hearing, Bundy Dimes and Bunwil filed their voluntary petitions under chapter 11 of the Bankruptcy Code and, shortly after the hearing, Mission Real filed its voluntary petition.  On April 2, 2010, the Debtors each filed a *Joinder and Stipulation to Be Bound by Order Granting Motion of R. Todd Neilson, Chapter 11 Trustee for Ezri Namvar for an Order Approving Sale Procedures and Bid Protections, Etc. in Connection With the Sale of the Land and Building Located at Wilshire Bundy Plaza* (collectively, the "Stipulations").

At the Sale Procedures Hearing, the Court orally approved the Sale Procedures with certain modifications.  After the Trustee and the Namco Committee submitted declarations regarding the Namco Committee's objection to certain aspects of the form of order approving the Sale Procedures Motion, the Court, on April 6, 2010, entered the Sale Procedures Order, and the orders approving the Stipulations in the Bundy Dimes, Mission Real and Bunwil Capital cases on April 7, 2010.

**L.**      **The Property Owners' Agreement Regarding the Sale of the Property**

As described above, the Debtors own the Property as tenants in common with the other Property Owners.  It would be impractical for the Sellers to seek to sell the Debtors' interests in the Property separate from the interests of the Sellers and any buyer would pay substantially less for a fractional interest in the Property.

Therefore, on August 6, 2009, the Trustee, the chapter 11 trustee of Namco and the Property Owners entered into the Agreement re Leasing and Sale of Property and Addendum to Exclusive

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Right Listing Agreement and Exclusive Right Listing Agreement-Sale (the "Sale Agreement").[7]

2  The Sale Agreement, among other things, provides that the Trustee asserts the right to sell the

3  Property under 11 U.S.C. § 363(h) and that "… the Trustee and the Tenants in Common wish to

4  avoid the expense and uncertainty of prosecuting, responding to or litigating such an action."  Sale

5  Agreement, p.1.  In order to avoid litigation under section 363(h), the Property Owners, by the Sale

6  Agreement, agreed that "[t]he Property shall be leased, listed for sale, sold, with the proceeds to be

7  distributed as ordered by the Bankruptcy Court." Sale Agreement, ¶ 1, at p. 2.  Therefore, pursuant

8  to the Sale Agreement, which was approved by order of the Court entered on November 11, 2009,

9  (the "Sale Agreement and Broker Employment Order") (Docket No. 379) but which, in any event, is

10  a legally binding agreement on the non-Debtor Property Owners even absent the approval of the

11  Court, the Property Owners have consented to the sale of their undivided interests in the Property.

12          Although the non-Debtor Property Owners have consented in writing to the sale of the

13  Property and, therefore, the "consent" requirement of section 363(f)(2) of the Bankruptcy Code has

14  been met, out of an abundance of caution, Bundy Dimes and Mission Real have filed adversary

15  proceedings against the non-Debtor Property Owners pursuant to section 363(h) of the Bankruptcy

16  Code, seeking the entry of a judgment against the non-Debtor Property Owners allowing the sale of

17  their interests in the Property (the "Adversary Proceedings").  The Sellers believe that the legally

18  binding Sale Agreement, wherein the Property Owners agreed to the sale of their interests in the

19  Property for the specific purpose, among others, of avoiding litigation under section 363(h) of the

20  Bankruptcy Code, constitutes consent under section 363(f)(2) of the Bankruptcy Code and,

21  therefore, moots the need for the Adversary Proceedings.

22  **M.    Disbursement of the Proceeds of the Sale**

23          The Sale Agreement provides that the proceeds of the sale of the Property, including the

24  closing costs, are to be distributed to the Trustee, held in a segregated account and disbursed as

25  ordered by the Bankruptcy Court.  Sale Agreement, ¶ 4, at p. 2.  The one percent (1%) commission

26  to be paid to Madison Partners was agreed to by the Property Owners when they signed the Sale

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

27  [7] On August 31, 2009, the Trustee filed his *Motion to Approve Agreement Regarding Sale of Property and Employment
    of Real Estate Broker and to Employ Real Estate Broker and Leasing Agent Pursuant to Exclusive Listing Agreement*

28  (Docket No. 292) seeking approval of the Sale Agreement.

59918-002\DOCS_LA:215143.8                                    18

Agreement and was approved by the Court pursuant to the Sale Agreement and Broker Employment

Order.  The other estimated closing costs, as set forth on **Exhibit "3"** attached hereto are typical

closing costs for a sale of this size and nature.  The Sellers are requesting that the Sale Order

authorize the Trustee to pay, at the time of the Closing (as defined in the PSA), the closing costs of

the sale to be paid by the Sellers pursuant to the PSA, including, but not limited to, the commission

to Madison Partners.  The Trustee, adhering to his obligation under the Sale Agreement, will hold

the balance of the proceeds from the sale in a segregated account pending resolution of the disputes

related thereto and further order of the Court.

**N.**    **Tax Consequences to the Sellers of the Sale**

The Property Owners are all limited liability companies which, for federal income tax

purposes, are treated as partnerships.  Each Property Owner owns a specified percentage in the

Property as Tenants in Common.  The adjusted tax basis of assets owned by the Property Owners has

historically been reported on the income tax returns of each Property Owner and depreciation

expense has been deducted, when applicable.  When computing tax gain from the sale of the

Property, the proceeds from the sale would be allocated to each Property Owner, based on each

entity's ownership percentage of the Property, however, the tax consequences will flow through to

the owners of the Property Owners, so there will be no direct federal tax consequences to Bundy

Dimes, Mission Real or Bunwil.  However, the Debtors will be liable for a minimal California

Limited Liability Company Fee.

Initial computations indicate that, at a sales price of $100 million, gain of approximately

$23.4 million will be reportable, via flow-through from the Property Owners, to the Namvar estate.

In the absence of losses generated from the administration of the Namvar case and the utilization of

other tax benefits from federal and California loss carryforwards and carrybacks, this gain would

result in a tax liability in excess of $5.7 million to the Namvar estate.  However, the Trustee believes

that the Namvar estate has or will have at its disposal losses generated from the administration of the

case that can either be carried forward from previous tax years or carried back from future tax years

to fully offset the Namvar estate's gain generated from the sale of the Property.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**III.**

**RELIEF REQUESTED**

The Sellers, pursuant to this Sale Motion, are requesting that this Court authorize and approve (a) the sale of the Property to the Proposed Purchaser pursuant to the PSA, or, alternatively, to the Successful Bidder pursuant to such competing agreement with such Successful Bidder entered into in accordance with the Sale Procedures Order, free and clear of all liens, claims, rights (including, without limitation any right of first refusal or first offer), encumbrances and other interests (including, without limitation, any interests of co-owners), except the Assumable Loans, non-delinquent real estate taxes and other assessments, and other Permitted Exceptions, pursuant to sections 363(b), (f), (h) and (m) of the Bankruptcy Code, with such Liens to attach to the sale proceeds of the Property with the same validity, priority and perfection as existed immediately prior to such sale; (b) the assumption and assignment of the Sellers' interests in Selected Contracts and Leases; (c) the distribution of the sale proceeds to the Trustee; (d) the payment by the Trustee, at closing from the proceeds of the sale, the closing costs of the sale that are to be paid by the Sellers pursuant to the PSA, including, but not limited to, the commission due to Madison Partners; and (e) for such further relief as is just and proper under the circumstances.

**IV.**

**ARGUMENT**

**A.    Cause Exists to Approve the Sale of the Property Under Section 363(b) of the Bankruptcy Code**

Section 363(b)(1) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.".  11 U.S.C. § 363(b)(1). Section 105(a) provides in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

A debtor's application of its sound business judgment in the use, sale, or lease of property is subject to great judicial deference. *See, e.g.*, *In re Moore*, 110 B.R. 924 (Bankr. C.D. Cal. 1990).  A

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   sale of a debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a

2   sound business reason exists for doing so. *See Stephens Indus. V. McClung*, 789 F. Ed 386, 390 (6th

3   Cir. 1986) ("bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under [Section]

4   363(b)(1) when a sound business purpose dictates such action."); *In re Continental Airlines, Inc.*,

5   780 F.2d 1223, 1226 (5th Cir. 1986); *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20

6   (B.A.P. 9th Cir. 1988) ("[T]here must be some articulated business justification for using, selling, or

7   leasing the property outside the ordinary course of business . . . whether the proffered business

8   justification is sufficient depends on the facts of the case.  As the Second Circuit held in *Lionel*, the

9   bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly,

10  act to further the diverse interests of the debtor, creditors and equity holders, alike."); *In re Canyon

11  P'ship*, 55 B.R. 520 (Bankr. S.D. Cal. 1985).

12          In determining if a sound business justification exists for the sale of a debtor's property, the

13  Court, among other factors, should consider (a) the consideration to be paid, (b) the financial

14  condition and needs of the debtor, (c) the qualifications of the buyer, and (d) whether a risk exists

15  that the assets proposed to be sold would decline in value if left in the debtor's possession.  *See

16  Equity Funding Corp. of Am. v. Fin. Assocs. (In re Equity Funding Corp.)*, 492 F.2d 793, 794 (9th

17  Cir. 1974) (affirming trial court's finding that the proposed sale of the debtor's assets would be in

18  the best interest of the estate in light of impending deterioration of market value of debtor's assets),

19  *cert. denied sub nom*, *Herman Inv. Co. v. Loeffler*, 419 U.S. 964 (1974).

20          1.      **Consideration to Be Paid**

21          As noted above, following coordinated efforts to sell the Property, the Sellers and their

22  professionals concluded that the sale of the Property to the Proposed Purchaser would maximize

23  value for their respective estates.  Here, the proposed sale of the Property will be tested through a

24  public auction consistent with the requirements of the Bankruptcy Code.  Upon the conclusion of

25  that auction, the Sellers, the Court, and all parties in interest can be assured that the Property will be

26  sold for the best price available under the circumstances.  Consequently, the fairness and

27  reasonableness of the consideration to be received by the Sellers ultimately will be demonstrated by

28  adequate "market exposure" via the extensive marketing of the Property that has been undertaken

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and the auction process, which, taken together, affords the best available mechanism for establishing the fairness and reasonableness of a purchase price. The Sellers have therefore determined, in the exercise of their business judgment, that the sale of the Property to the Proposed Purchaser or other Successful Bidder is in the best interests of the estates.

**2.      The Financial Condition and the Needs of the Sellers**

Because the ultimate disposition of the proceeds of the sale are yet to be determined, and may not be determined for some time, the immediate need of the estates of the Sellers was not a major factor in the Sellers' decision to sell the Property. However, as noted above, the maintenance of operating income sufficient to meet debt service is challenged and the ability of the Property to generate sufficient revenues on a stand alone basis to meet its obligations during the pendency of the Namvar chapter 11 case thus far has been uncertain. The Sellers do not believe that the Property Owners are in a financial position to meet the demands related to tenant concessions in order to compete in this commercial leasing market, to continue to meet operating expenses and to service the debt on the Property.

**3.      The Qualifications of the Buyer**

In the course of evaluating the Proposed Purchaser's bid for the Property and in identifying the Proposed Purchaser as the Stalking Horse Bidder, he Sellers have investigated the ability of the Proposed Purchaser to close the sale and believe that such ability exists.

**4.      Risk of Decline in Value of the Property**

The risk of the decline in value of the Property is discussed in detail above in section H. As set forth therein, based upon the (i) current economic conditions, (ii) amount of commercial real estate debt coming due between now and 2013, (iii) trends in declining occupancy rates and declining rental incomes, (iv) history of the previous offers received on the Property, and (v) the Sellers' and, in all likelihood, the other Property Owners' lack of resources to keep or attract new tenants and to support the Property, the Sellers believe that if the Property is not sold at this time, there is a strong possibility that it will decline in value.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**B.      Sale of the Property Free and Clear of Liens, Claims, Interests, and Encumbrances**

**Pursuant to 11 U.S.C. § 363(f)**

Pursuant to section 363(f) of the Bankruptcy Code, the Sellers requests that the Court approve the sale of the Property to the Proposed Purchaser or the Successful Bidder free and clear of all Liens (which excludes non-delinquent real estate taxes and assessments,  the Assumed Liabilities and other Permitted Exceptions as set forth in the PSA but includes, among other liens, claims, interests, rights (including any rights of first refusal or first offer) and encumbrances, the ownership interests of the non-Debtor Property Owners), with any such Liens to attach to the proceeds of the sale with the same validity and priority as existed prior to the sale.

Section 363(f) of the Bankruptcy Code expressly authorizes a debtor to sell property outside the ordinary course of business "free and clear of any interest in such property of an entity" if any one of the five following conditions is met:

(a)      applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b)      such entity consents;

(c)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)      such interest is in bona fide dispute; or

(e)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Because section 363(f) of the Bankruptcy Code is written in the disjunctive, any one of these five conditions provides authority to sell the Property free and clear of liens.  *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988).  The Sellers submit that at least one of the conditions is met as to each of the Liens that is not a permitted encumbrance or an assumed liability.  Further, the interests of each of the holders of such Liens is adequately protected by either being paid in full at the time of closing, or by having such Liens attach to the net proceeds of the sale, subject to any claims and defenses the Sellers may possess with respect thereto.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**1.      Parties Asserting Interests in the Property Consent to the Sale (11 U.S.C. §363(f)(2))**

Section 363(f)(2) of the Bankruptcy Code provides that a debtor may sell property of the estate "free and clear of any interest in such property of an entity other than the estate, only if—(2) such entity consents…." Initially, as stated above, the non-Debtor Property Owners, by signing the Sale Agreement, consented to the sale of the Property. When co-owners have consented to the sale of the assets of a debtor, as they have here, there is no need for an adversary proceeding under section 363(h) of the Bankruptcy Code. *Veltman v. Whetzal*, 93 F.3d 517, 522 (8th Cir. 1996); *In re Friedel*, 324 B.R. 138, 143 (Bankr. M. D. Ala. 2004) citing *Veltman*. The Court can and should approve the sale of Property free and clear of the interests of the non-Debtor Property Owners pursuant to the Court-approved, binding, written Sale Agreement.

Additionally, to the extent that any party asserting a Lien receives notice of this Sale Motion and does not file a written objection hereto, such party should be deemed to have consented to the proposed sale of the Property free and clear of its asserted Lien. *See In re Channel One Commc'ns, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990).

Accordingly, the Sellers submit that approval of the sale of the Property free and clear of Liens, including, but not limited to, the interests of the non-Debtor Property Owners, is appropriate under section 363(f)(2).

**2.      Purchase Price Exceeds Lien Amounts (11 U.S.C. §363(f)(3))**

Section 363(f)(3) of the Bankruptcy Code permits a sale free and clear of a lien if "the price at which [the] property is to be sold is greater than the aggregate value of all liens in such property." 11 U.S.C. § 363(f)(3); *see Clear Channel v. Knupfer*, 391 B.R. 25, 41 (B.A.P. 9th Cir. 2008).

In the Sale Procedures Motion, the Trustee noted the following items asserted against the Property:  (i) notice of a pending court action, entitled Homayoun Namvar, et al. v. Paul Daneshrad, et al., recorded June 22, 2009 ($5 million asserted in litigation); (ii) notice of a pending court action, entitled Khalil Varastehpour v. Civic Palm LLC, et al., recorded December 18, 2009 ($350,000 asserted in litigation); (iii) attachment regarding Trifish, LLC, and Hooshang Namvar, recorded December 28, 2009; (iv) attachment regarding Tribun, LLC, recorded December 28, 2009; (v)

1    attachment regarding Trifish, LLC, and Hooshang Namvar, recorded December 28, 2009; (vi)

2    attachment regarding Trifish, LLC, and Hooshang Namvar, recorded December 28, 2009; and (vii)

3    attachment regarding Trifish, LLC, and Hooshang Namvar, recorded December 31, 2009 (all of the

4    foregoing relate to a single action for $1 million).  There are UCC statements filed by HSBC Realty

5    Credit Corporation, however, these statements, filed in 2004, have lapsed, therefore, no security

6    interest exists in any of the Personal Property being sold as a result of these filings.

7         The Sellers do not concede that any of the foregoing constitute valid "liens" on the Property

8    but, even if their validity were established, the aggregate amount claimed does not equal or exceed

9    the Purchase Price.  Consequently, the Property may be sold free and clear of all such alleged liens

10   pursuant to section 363(f)(3) of the Bankruptcy Code.

11        **3.        Property May Be Sold Free and Clear of Interests in Bona Fide Dispute (11**

12   **U.S.C. §363(f)(4))**

13        The Sellers dispute the Liens listed on **Exhibit "2"** attached hereto and such disputes are

14   bona fide.  The pending court action filed by Homayoun Namvar resulted in a counter-claim asserted

15   by the Starpoint group and the recording of a lis pendens.  Starpoint asserts a vendee's lien arising

16   out of a failed sale transaction in which a $5,000,000 deposit was released from escrow and not

17   refunded.  An order was obtained expunging the lis pendens and the Starpoint group has filed a writ.

18   The Sellers assert, among other things, that the vendee's lien is avoidable as a fraudulent conveyance

19   or otherwise and the Property Owners assert, among other things, that the Starpoint group breached

20   the sale contract and are not entitled to a return of the deposit.

21        In the Varastehpour court action, Varastehpour asserts an equitable lien based on a supposed

22   promise to be given a deed of trust.  A motion to expunge the lis pendens was pending at the time the

23   Debtors filed their chapter 11 cases.  The Sellers dispute the alleged lien on the grounds, among

24   others, that any such lien would be avoidable as a fraudulent conveyance or a preference as it was

25   not perfected and because the investment on which it is based was an investment in Namco with no

26   consideration going to the Property Owners.

27        Rad filed a court action against Trifish, LLC and Hooshang Namvar and was granted a right

28   to attach order against Trifish and Hooshang Namvar, yet Rad has levied on the rents at the Property

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    and recorded the attachment with the description of the Property.  He has no valid lien or claim

2    against the Property or the Property Owners.

3    The UCC filing of HSBC Realty Credit Corporation against the Property was filed in 2004

4    and, pursuant to section 9515(a) of the Uniform Commercial Code, the filings have lapsed and are of

5    no effect.

6    As demonstrated by the above discussion, there are bona fide disputes existing against all the

7    liens, claims and encumbrances listed on Exhibit "2", therefore, the Sellers are entitled to sell the

8    Property free and clear of all such alleged liens, claims and encumbrances.

9    **4.    Parties Asserting Interests in the Property Could Be Compelled to Accept a**

10    **Money Satisfaction (11 U.S.C. §363(f)(5))**

11    Section 363(f)(5) of the Bankruptcy Code provides that assets may be sold free and clear of

12    liens if the holders "could be compelled, in a legal or equitable proceeding, to accept a money

13    satisfaction of [their] interest[s]."  11 U.S.C. § 363(f)(5).  To the extent any alleged lien, claim or

14    encumbrance is found to be valid and enforceable against the Property, the Sellers believe that the

15    sale proceeds are sufficient to satisfy such Lien in full.

16    In general, all holders of liens, claims and encumbrances can be compelled to accept the full

17    amount to which they are entitled.  Moreover, to the extent any alleged lien, claim or encumbrance

18    that is valid and enforceable against the Property cannot be satisfied in full, provisions exist under

19    non-bankruptcy law in which a lienholder may be compelled to accept a monetary judgment less

20    than the amount of its lien. *See Clear Channel*, 391 B.R. at 45-46, *e.g.* California Civil Code §

21    2924k (order of distribution of foreclosure sale proceeds where lienholders other than foreclosing

22    lender paid next to last on account of their interests).  Section 363(f)(5) requires merely that "there

23    be the possibility of, some proceeding, either at law or at equity, in which the nondebtor could be

24    forced to accept money in satisfaction of its interest." *Clear Channel*, 391 B.R. at 45.

25    In addition to state law provisions which compel a lienholder to accept less than the amount

26    of its lien, some have argued that section 1129(b)(2) of the Bankruptcy Code permits a debtor or

27    trustee to retain property and cram down objecting creditors upon payment of the actual value of the

28    collateral. *See, e.g.*, *In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821, 829 (N.D. Ill. 1993)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  (holding that a creditor who could be crammed down under section 1129(b) could be compelled to

2  accept a money satisfaction of his interest under section 363(f)(5)); *In re Hunt Energy Co., Inc.*, 48

3  B.R. 472, 485 (Bankr. N.D. Ohio 1985) (same); *In re Weyland*, 63 B.R. 854, 860-61 (Bankr. E.D.

4  Wisc. 1986) (same); *In re Red Oak Farms, Inc.*, 36 B.R. 856, 858 (Bankr. W.D. Mo. 1984); *Cf.*

5  *Clear Channel*, 391 B.R. at 46.  Under section 1129(b)(2) of the Bankruptcy Code, any lienholder

6  could be compelled to accept a monetary satisfaction of its claims.  Under section 506(a) of the

7  Bankruptcy Code, the amount of a secured claim is limited to the value of the collateral securing

8  such claim.  As a result, a fair price for the collateral itself establishes the maximum amount of a

9  creditor's secured claim.  In addition, under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, a

10  secured creditor's collateral may be sold free and clear of liens with liens to attach to proceeds.

11      Because holders of valid liens, claims and encumbrances enforceable against the Property

12  could be compelled to accept money satisfaction of their interests, the Property may therefore be

13  sold free and clear of any such Liens pursuant to section 363(f)(5) of the Bankruptcy Code.

14  **C.**      **The Sale Will Be Made in Good Faith Under Section 363(m) of the Bankruptcy Code**

15      The Sellers seek a finding of good faith under section 363(m) of the Bankruptcy Code with

16  respect to the sale of the Property to the Proposed Purchaser or the Successful Bidder.  "Though the

17  Bankruptcy Code and Rules do not define good faith, courts generally have followed traditional

18  equitable principles in holding that a good faith purchaser is one who buys 'in good faith' and 'for

19  value.'"  *Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 280 (9th Cir. 1992) (citation omitted) *see also*

20  *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D. N.Y. 1988) (quoting *In re Bel Air Asocs., Ltd*., 706

21  F. 2d 301, 305 (10th Cir. 1983) (to demonstrate a lack of good faith, one must show fraud, collusion

22  or gross unfairness).  "The requirement that a purchaser act in good faith...speaks to the integrity of

23  his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a

24  purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and

25  other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *In re*

26  *Abbotts Dairies of Pennsylvania, Inc.*,  788 F. 2d 143,147 (3rd Cir. 1986)(citation omitted).

27      The Proposed Purchaser was selected by the Sellers after exposing the Property to thousands

28  of parties, entering into confidentiality agreements with hundreds of potential purchasers so that they

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    would have access to the data room established by the broker and the Trustee, receiving forty-one

2    (41) offers to purchase the Property, seventeen (17) of which were in excess of $90 million, and

3    entering into negotiations with those parties whose offers were the highest and best. There is no

4    relationship between the Sellers and the Proposed Purchaser.  The Sellers and the Proposed

5    Purchaser negotiated the PSA in good faith and at arm's length to arrive at a fair and reasonable

6    purchase price for the Property.  The auction process will, as noted above, test the value of the

7    Property and the appropriateness of the Proposed Purchaser's or Successful Bidder's purchase price.

8    The Sellers believe that the marketing process to which the Property was subject, combined with the

9    auction process, will yield the highest and best price for the Property.  Accordingly, the Sellers

10   submit that the Proposed Purchaser or other Successful Bidder is entitled to all of the protections

11   afforded to good faith purchasers under section 363(m) of the Bankruptcy Code.  The Sellers will be

12   prepared to present further evidence of the good faith of the Successful Bidder at the Sale Hearing.

13   **D.**    **The Proceeds of the Sale Should Be Distributed to the Trustee and the Trustee Should**

14          **Be Authorized to Pay the Sellers Closing Costs**

15          As stated above, the Sale Agreement provides that the proceeds of the sale of the Property,

16   including the closing costs, are to be distributed to the Trustee, held in a segregated account and

17   disbursed as ordered by the Bankruptcy Court. Sale Agreement, ¶ 4, at p. 2.  Because there are

18   disputes over the right to certain amounts of the proceeds of the sale that make it necessary for the

19   proceeds to be held until the disputes are resolved and the Property Owners have already agreed that

20   the Trustee should hold the proceeds in a segregated account until further order of the Court, the

21   Sellers request that the Court order that the proceeds be delivered to the Trustee at closing.

22          Further, there being no dispute as to the one percent (1%) commission to be paid to Madison

23   Partners, which was agreed to by the Property Owners when they signed the Sale Agreement and

24   was approved by the Court pursuant to the Sale Agreement and Broker Employment Order, the

25   Sellers request that the Court approve and authorize the payment of the commission by the Trustee

26   to Madison Partners.  The other estimated closing costs, as set forth on **Exhibit "3"** attached hereto

27   are typical closing costs for a sale of this size and nature.  The title and escrow companies involved

28   in the sale transaction will not close the transaction without being paid and the documents cannot be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  recorded without the concurrent payment of the transfer taxes.  There is no legitimate reason not to

2  pay the costs at closing, however, non-payment could make it impossible to close the sale.  The

3  Sellers are requesting that the Sale Order authorize the Trustee to pay, at the time of the closing of

4  the sale transaction, the closing costs of the sale to be paid by the Sellers pursuant to the PSA.

5  **E.**  **Cause Exists to Approve the Assumption and Assignment of the Selected Contracts and**

6  **Leases**

7  Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's

8  approval, may assume or reject any executory contract or unexpired lease."  11 U.S.C. § 365(a).

9  Since 1943, Courts have applied the "business judgment test" to determine whether a debtor may

10  assume or reject a lease.  *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific*

11  *R. Co.*, 318 U.S. 523 (1943); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th

12  Cir. 1982) (affirming bankruptcy court's authorization of assumption of lease); *Robertson v. Pierce*

13  *(In re Chi-Feng Huang)*, 23 B.R. 798, 800 (BAP 9th Cir. 1982) (reversing bankruptcy court's refusal

14  to authorize rejection of contract).  In applying the business judgment standard, courts show great

15  deference to a debtor's decision to assume or reject.  *See, e.g., Summit Land Co. v. Allen (In re*

16  *Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (noting that, absent extraordinary

17  circumstances, court approval of a debtor's decision to assume or reject an executory contract

18  "should be granted as a matter of course").

19  A debtor satisfies the "business judgment" test when it determines, in good faith, that

20  assumption and assignment of an unexpired lease or executory contract will benefit the debtor's

21  estate and unsecured creditors.  *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D. N.C. 1986); *In re*

22  *Chipwich Inc.*, 54 B.R. 427, 430-31 (Bankr. S.D. N.Y. 1985).

23  In this instance, the Proposed Purchaser has identified the Selected Contracts and Leases as

24  those that it believes are beneficial to it as owner of the Property.  The assignment of the Sellers'

25  interests in Selected Contracts and Leases is a condition to its purchase of the Property because most

26  of the leases to be assumed and assigned are tenant leases or otherwise relate to the operation of the

27  Property.  Once the Property is sold to the Proposed Purchaser or the Successful Bidder, the Selected

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Contracts and Leases will be of little or no value to the Debtors. There is a valid business

justification for the assumption and assignment of the Selected Leases and Contracts.

Section 365(f) of the Code provides, in pertinent part:

> (1) [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

> (2) The trustee may assign an executory contract or executory lease of the debtor only if —

> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(1) and (2). In order to assume such a contract or lease, the trustee (debtor in

possession) must cure monetary defaults under such contract or lease and compensate the counter-

party for any actual pecuniary loss to such counter party resulting from the defaults under such lease

or contract. 11 U.S.C. § 365(b).

The Sellers are sending the Cure Notice, as approved by this Court as part of the Sale

Procedures Order, to all non-Debtor parties to the Selected Contracts and Leases (the

"Counterparties"). That cure notice specifies what the Debtors believe to be the amount due to those

Counterparties in order to cure defaults under the Selected Contracts and Leases (the "Cure

Amounts"), if there have been any defaults. Because most of the Selected Contracts and Leases are

the tenant leases under which the Debtors are the landlord parties, there are no defaults at this time

and no defaults are anticipated prior to the closing. The Counterparties are being given an

opportunity to object to the Cure Amounts and, to the extent the parties cannot agree on a disputed

Cure Amount, this Court will determine the correct amount. If no objection is raised by a

Counterparty to the Cure Amount for one of the Selected Contracts and Leases, the Cure Amount set

forth by the Debtors will be deemed to correct Cure Amount and such Cure Amount will be paid by

the Sellers.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The United States Court of Appeals for the Ninth Circuit has held that adequate assurance must be more than an "empty statement" promising to make rental payments. *Elliott v. Four Seasons Properties (In re Frontier Properties, Inc.)*, 979 F.2d 1358, 1366 (9th Cir. 1992), *citing Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077, 1080 (9th Cir. 1989). The proposed assurance, however, need not make performance certain; it only must make continued performance likely, meaning more probable than not.

> In making the determination of "adequate assurance", [sic] the Court must give a practical pragmatic construction based on the circumstance of each case. Assurance is adequate if performance is likely; that is, more probable than not.

*Tama Beef Packing Inc.*, 277 B.R. 407, 411 (Bankr. N.D. Iowa 2002).[8] The issue is whether the assignee will perform under the assigned contract or lease. No performance greater than the performance required of the assignor is required of the assignee. *See, e.g., Tama Beef Packing Inc.*, 277 B.R. 407, 411 (Bankr. N.D. Iowa 2002); *In re Lafayette Radio Electronics Corp.*, 9 B.R. 993, 998 (Bankr. E.D. N.Y. 1981) ("[t]he landlord cannot be granted any greater rights than what the lease provides.").

As set forth in the Cure Notice to be sent to all of the Counterparties, the Proposed Purchaser will make  its financial information available to any of the Counterparties that request same. Further, the Proposed Purchaser or the Successful Bidder will present evidence at the Sale Hearing of its ability to perform pursuant to the terms of the Selected Contracts and Leases.

The Sellers submit that the requirements for the assumption and assignment of the Selected Contracts and Leases will be met and the Court should approve such.

## F.    Notice of the Sale

The Sellers have served this Sale Motion, the PSA, the Notice of Auction and Sale Hearing (as defined in the Sale Procedures Order), the Sale Procedures and the Sale Procedures Order, by first-class mail, postage prepaid (except as otherwise permitted by the Court), upon (a) the Office of the United States Trustee; (b) the Stalking Horse Bidder and its counsel; (c) counsel to the Namvar

---

[8]    *See In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); *In re; Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1989). *See also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D. N.Y. 1985); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Committee; (d) counsel for the Chapter 11 Trustee of Namco Capital Group, Inc.; (e) counsel for the Official Committee of Unsecured Creditors of Namco Capital Group, Inc.; (f) all the creditors of Bundy Dimes; (g) all the creditors of Mission Real; (h) all creditors of Bunwil; (i) all parties to be provided notice pursuant to the court's order establishing notice procedures and permitting notice on insured depository institutions by first class mail in the Namvar chapter 11 case; (j) all entities known to have asserted any Lien against the Property; (k) all non-Debtor Property Owners; (l) counsel to the Assumable Financing Lenders; (m) all entities that executed confidentiality agreements with the Trustee's real estate broker in connection with a potential acquisition of the Property or who otherwise have expressed to the Trustee or any of his professionals an interest in purchasing the Property; (n) all federal, state, and local regulatory or taxing authorities or recording offices that have a reasonably known interest in the relief requested by the Motion; (o) the Internal Revenue Service; and (p) all entities who have requested special notice pursuant to Bankruptcy Rule 2002 in the Namvar and the Debtors cases as of such date (collectively, the "Sale Notice Parties").

Several sections of the Bankruptcy Code dictate the sufficiency of notice and adequacy of service. As discussed below, the content and manner of service of this Sale Motion and the related notices contemplated under the Sale Procedures Order satisfies all such requirements:

- **Section 363 Notice**: Section 363 of the Bankruptcy Code provides that a trustee may sell property "after notice and hearing." Under section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). As set forth above, creditors have been or will shortly be provided notice of the salient details regarding this Sale Motion and the Sale Hearing. Accordingly, notice is sufficient under section 363 of the Bankruptcy Code.

- **Federal Rule of Bankruptcy Procedure 2002**: Rule 2002 requires twenty-one days notice of proposed sales of property other than in the ordinary course of business. In addition, Rule 2002 provides that, as to sales, notice of a sale shall describe the property to be sold and "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002. As noted above, the Sellers are providing at least twenty-one days notice of the proposed sale to all parties in interest. The Sellers believe that the notices approved under the Sale Procedures Order contain the requisite information to reasonably notify parties in interest in satisfaction of the foregoing rules and requirements.

- Federal Rules of Bankruptcy Procedure 6004: Rule 6004 requires that notices of sales of property out of the ordinary course of business comply with Rule 2002. As set forth above, the Sellers have complied or will comply with Rule 2002.

- Procedural Due Process: The notice of this Sale Motion that is being provided is "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950). Parties in interest have been or will be and should be found to have been afforded adequate notice of this Sale Motion and the Sale Hearing.

The Sellers submit that the notice that they have provided and intend to provide of the Sale Procedures, this Sale Motion, the auction and the Sale Hearing is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

## G.    Request for Waiver of Rule 6004(h) Stay

The Sellers request that the order approving the sale become effective immediately upon its entry. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the …stay period, commentators suggest that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 *Collier on Bankruptcy*, ¶ 6064.09 (L. King, 15th rev. ed.). Given the timing of the various steps of the sale, including the lengthy due diligence period the Assumable Financing Lenders are insisting upon regarding the assumption of the Assumable Loans, and the fact that the Sellers will provide notice in a manner that is reasonable under the circumstances, the Sellers submit that good cause exists for the Court to waive the stay period under Bankruptcy Rule 6004(h) so that the closing process can begin as soon as possible.

1

## V.

2

## CONCLUSION

3       For all the foregoing reasons, the Sellers respectfully request that the Court enter an order: (a)

4   approving the sale of the Property to the Proposed Purchaser or the Successful Bidder, free and clear

5   of all Liens, which excludes any non-delinquent tax liens or assessments, the Assumable Liabilities

6   and the Permitted Exceptions but includes the interests of the non-Debtor Property Owners, with any

7   such Liens to attach to the proceeds of the sale with the same validity and priority as existed prior to

8   the sale; (b) finding that the Proposed Purchaser or the Successful Bidder is a good faith purchaser

9   under section 363(m) of the Bankruptcy Code; (c) authorizing the disbursement of proceeds of the

10  sale to the Trustee; (d) authorizing the Trustee to pay the costs of the sale that, pursuant to the PSA,

11  are to be paid by the Sellers, including, but not limited to the commission to Madison Partners, at the

12  time of the closing of the sale transaction; (e) approving the assumption and assignment of the

13  Sellers' interests in the Selected Contracts and Leases; and (f) granting such other and further relief

14  as is just and proper under the circumstances.

15

16  Dated:    April 8, 2010                    PACHULSKI STANG ZIEHL & JONES LLP

17

18                                  By    /s/  Malhar S. Pagay
                                          Richard M. Pachulski (CA Bar No. 90073)
19                                        Malhar S. Pagay (CA Bar No. 189289)
                                          Scotta E. McFarland (CA Bar No. 165391)
20
                                          Special Counsel for R. Todd Neilson,
21                                        Chapter 11 Trustee for Ezri Namvar and
                                          Proposed Special Counsel to Bundy
22                                        Dimes, LLC and Mission Real, LLC,
                                          Debtors and Debtors in Possession

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA