1  SANDFORD L. FREY (State Bar No. 117058)
   STUART I. KOENIG (State Bar No. 102764)
2  CREIM MACIAS KOENIG & FREY LLP
   633 W. Fifth Street, 51st Floor
3  Los Angeles, CA  90071
   (213) 614-1944 Telephone
4  (213) 614-1961 Fax
   Sfrey@cmkllp.com
5  Skoenig@cmkllp.com

6

7  Attorneys for Official Committee of Unsecured
   Creditors of Namco Capital Group, Inc.

8

9  Leonard M. Shulman – Bar No. 126349
   Melissa R. Davis – Bar No. 245521
   **SHULMAN HODGES & BASTIAN LLP**
10  26632 Towne Centre Drive, Suite 300
   Foothill Ranch, California 92610-2808
11  Telephone:      (949) 340-3400
   Facsimile:      (949) 340-3000
12  lshulman@shbllp.com
   mdavis@shbllp.com
13

14  General Counsel for the Official Committee of Unsecured Creditors
   of the Bankruptcy Estate of Ezri Namvar

15                UNITED STATES BANKRUPTCY COURT

16                CENTRAL DISTRICT OF CALIFORNIA

17                  [LOS ANGELES DIVISION]

| | |
|---|---|
| 18  In re | CASE NO.: 2:10-bk-22370-BR |
| 19 | |
|     MISSION REAL ASSOCIATES, LLC, | Chapter 11 |
| 20 | |
|          Debtor. | **JOINT OPPOSITION OF THE** |
| 21 | **OFFICIAL COMMITTEE OF** |
|     | **UNSECURED CREDITORS OF** |
| 22 | **NAMCO CAPITAL GROUP AND** |
|     | **THE OFFICIAL COMMITTEE OF** |
| 23 | **UNSECURED CREDITORS OF EZRI** |
|     | **NAMVAR TO THE JOINT MOTION** |
| 24 | **OF DEBTORS AND CHAPTER 11** |
|     | **TRUSTEE FOR ORDER (A)** |
| 25 | **APPROVING THE SALE OF** |
|     | **WILSHIRE BUNDY PLAZA FREE** |
| 26 | **AND CLEAR OF CERTAIN LIENS,** |
|     | **CLAIMS INTERESTS, AND** |
| 27 | **ENCUMBRANCES; (B)** |
| 28 | |

CREIM, MACIAS, KOENIG & FREY LLP
611 WEST SIXTH STREET, 16TH FLOOR
LOS ANGELES, . CALIFORNIA 90017
(213) 614-1944

CREIM, MACIAS, KOENIG & FREY LLP
611 WEST SIXTH STREET, 16TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 614-1944

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**AUTHORIZING DISTRIBUTION OF
THE SALE PROCEEDS TO THE
TRUSTEE; (C) AUTHORIZING THE
TRUSTEE TO PAY CERTAIN COSTS
OF SALE AND COMMISSION; (D)
AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF
CONTRACTS AND LEASES; AND
(E) GRANTING RELATED RELIEF;
DECLARATION OF M. FREDDIE
REISS IN SUPPORT THEREOF
[FILED SEPARATELY UNDER
SEAL]**

DATE:      May 12, 2010
TIME:      10:00 p.m.
CTRM:      1668

The Official Committee of Unsecured Creditors ("Namco Committee") of NAMCO

CAPITAL GROUP INC. ("Namco") and the Official Committee of Unsecured Creditors of Ezri

Namvar ("Namvar Committee" and collectively with the Namco Committee, the "Committees")

hereby submit their joint opposition to the motion of the Debtors and the Chapter 11 Trustee

("Trustee") for Ezri Namvar ("Namvar") for order: (1) Approving the Sale of the Land and Building

located at Wilshire Bundy Plaza Free and Clear of Certain Liens, Claims, Interests, and

1    Encumbrances; (2) Authorizing Distribution of the Sale Proceeds to the Trustee; (3) Authorizing the

2    Trustee to Play Certain Costs of Sale and Commissions; (4) Authorizing the Assumption and

3    Assignment of Contracts and Leases; and (5) Granting Related Relief, ("Motion") as follows:

4                                                    I.

5                                    **INTRODUCTION**

6            As explained in the Namco Committee's opposition to the Trustee's motion for approval of the

7    sales procedures (the "Procedures Motion") for the sale of the Wilshire Bundy Plaza (the "Property"),

8    the Committees are once again forced to take a stand against the Trustee, as the representative of the

9    creditors of the Namco Estate and the Namvar Estate.  However, this time the Committees do not

10   stand alone.  They are joined by hundreds of creditors of Namco and Namvar as well as the chapter 11

11   trustee for the Namco Exchange  in appealing to his Court to do justice and deny the Motion.  In fact,

12   no party in interest in any of the related cases is supporting the sale of the Property, other than the two

13   Trustees.

14           The Committees recognize and respect the role of the two Trustees in these cases.  The

15   Committees do not question that they believe that what they are doing is the proper thing to do, sell the

16   Property.  However, what the creditors do not understand is why the Trustees refuse to listen to the

17   very people they are supposed to represent, namely, the unsecured creditors?  At the hearing on the

18   Procedures Motion, this Court heard from two of the creditors who appeared as representatives of

19   hundreds of Namco and Namvar creditors, all of whom had signed a petition that the creditors

20   prepared pleading with this Court not to sell the Property.  In their own words, which conveyed better

21   than any pleading could, the creditors made clear to the Trustees and this Court that it was their

22   collective request that the Property be held and not be sold at this time.  This was done not in mere

23   defiance of the Trustees, but because they believe that this is the wrong time to sell an asset of this

24   type.  Many of the creditors of Namco and Namvar are experienced real estate developers and

25   investors.  In their collective wisdom, they have concluded that the timing is not right to sell the

26   Property, and because the Property is not in any danger of being lost to foreclosure, there is not

27   compelling need to sell, other then to generate funds for the Estate, which even the Motion admits,

28   will not be distributed any time soon.  Given the wealth of knowledge and experience that the creditor

CREIM, MACIAS, KOENIG & FREY LLP
611 WEST SIXTH STREET, 34TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 614-1944

body has in the development, investment and sale of commercial real estate, they are frustrated that their pleas are being ignored; and rightfully so.

The following facts are not subject to real dispute:

(1) The creditor bodies in these cases are composed primarily of individuals in the Persian Jewish community in the Greater Los Angeles area who loaned money to Namco.

(2) The creditors' money was invested in real estate, much of which has been lost forever as a result of the decline in the real estate market and, in many cases, improvident initial investment decisions.

(3) Within the creditor body there are many individuals who are wealthy, experienced real estate investors with an intimate and extensive knowledge of the commercial real estate market in West Los Angeles,

(4) One of those creditors is Joseph Ghadir, has filed a declaration in opposition to the Motion. Mr. Ghadir, and many of the other creditors who have filed declarations in opposition to the Motion, have far more extensive knowledge of, and far better "feel" for the commercial real estate market in West Los Angeles than do either of the trustees, or their real estate representative, Mr. Cicalese, who lives in Pennsylvania.

(5) Of all of the properties in the Namco/Namvar "umbrella" most likely there are fewer than 10 or 12 that will show any real likelihood of providing a source of funds to be used to pay the creditors. Of those 10 or 12 properties, the one with the most value, and the one with the greatest chance of being the source of significant return for the creditors, is Wilshire Bundy Plaza.

(6) It was in recognition of this fact that when certain members of the Committees met with the Trustees shortly after the Trustees were appointed, the first thing the creditors asked of the Trustees was that at all costs, they not sell the Property.

(7) The Trustee has not even tried to make a case for the proposition that the Property must be sold because the Estates may not have the funds to cover the debt service and carrying costs. The only evidence on this issue is the statement by Mr. Cicalese on page 2 of his declaration that "the ability of the Property to generate sufficient revenues on a stand alone basis to meet its obligations during the pendency of the Namvar chapter 11 case thus far has been uncertain." Hardly a compelling reason to sell the "crown jewel" of the entire real estate portfolio in the depths of one of the worst real estate markets this country has experienced since the great depression.

(8) The issue with respect to the timing of the disposition of the Property is really whether it is better to sell the Property now, or to hold the Property until the commercial real estate market returns to normal.

(9) The value of the Property in a normal market is demonstrated by the amounts of the offers that were made for the building in 2007. If those offers are any indication as to the value of the

CREIM, MACIAS, KOENIG & FREY LLP
601 WEST SIXTH STREET 14TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 614-1944

Property in a normal market, the Property may ultimately be worth $180 million. Frankly, that scenario occurring is probably the only real hope that the creditors have of ultimately receiving a double digit return on their claims.

(10)    It is also noteworthy that, as Mr. Reiss states in his declaration, the cap rate at which the Property is presently valued, for every $1.0 million increase in NOI for the Property, the value of the Property will increase by about $20.0 million.

(11)    After having had to accept the fact that under any reasonable circumstances, most of their loans to Namco will never be repaid, the creditors put their faith in the bankruptcy system. Thus far, they have been sadly disappointed with the manner in which their rights have been protected by the Trustees and their professionals.

(12)    The creditors, and the Persian Jewish community as a whole, are galvanized in their belief that thus far in the cases the Trustees and their professionals have incurred fees of in excess of $9.0 million, are still owed about $6.0 million of those fees, and are selling the Property against the wishes of the creditors in order to be a little bit closer to getting their fees paid and establishing a fund that they can spend pursuing the litigation that may have to be filed in the cases.

(13)    The Trustees have not provided a believable, reasonable, explanation as to why they have disregarded the opinions of creditors who live in the area, have a far greater knowledge of the prospects for the future recovery of the commercial real estate market in West Los Angeles than do either of the Trustees or Mr. Cicalese.

(14)    As Mr. Reiss points out in his declaration, sophisticated owners of commercial real estate are not selling their property in this depressed market unless they lack the financial ability to hold the property until the market normalizes. The logical thing for the Trustee to do with respect to the Property was to do everything in his power to retain the Property. The fact that they have chosen to do the exact opposite and market the Property in a distressed real estate market is inexplicable to the creditors.

(15)    Many of the creditors will be present at the hearing on the Motion. The Court's decision on the Motion will be a very important event in the entire Persian Jewish community. Counsel to the Committees have not been able to explain the actions of the Trustees in a way that is acceptable to the creditors. They will come to the hearing to observe the process first hand.

(16)    Counsel to the Committee have filed declarations signed by a significant number of creditors expressing their opposition to the Motion. The logistics of gathering the declarations is such that the filing of the declarations will be supplemented prior to the hearing on the Motion, but as of the filing of this Opposition declarations opposing the sale of the Property have been signed by 292 creditors, representing claims in the total principal amount of $198,138,000.00.

In opposition to the Procedures Motion, the Committee presented this Court with a question that they have asked throughout this case: Why are the Trustees continually making decisions which

CREIM, MACIAS, KOENIG & FREY LLP
611 WEST SIXTH STREET 16TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 614-1944

1   they know are against the will of the very people they have been appointed to represent and protect?

2   This question was raised in response to what the Committees are hearing on a daily basis from the

3   creditors they represent: "Why don't the trustees listen to us? Why don't they respect OUR decisions?

4   Isn't it OUR money that is at risk?" To the Committees and the creditors, it appears that the Trustees

5   are tone deaf to their interests. Given the decisions that the Trustees have made in these cases to date,

6   it is hard to argue that the Committees and the creditors are wrong in their conclusion.

7       In particular, it is hard to fathom how the Trustee can proceed to make a decision against the

8   explicit will of his beneficiaries while providing no convincing analysis to support his conclusion.

9   The Trustee has alluded to his inability to generate the cash to maintain the Property, but has not

10   shown any analysis to verify or quantify this need. If there is a cash need for the Property, the Trustee

11   has shown no evidence of his efforts to fund that cash need. The Trustee does not even conclude in

12   the Motion that there is a cash need to fund the Property, only that the ability of the Property to sustain

13   itself on a stand-alone basis "has been uncertain". Surely, more analysis than that is required to

14   undertake a decision opposed by his beneficiaries. To justify the timing of the sale now, the Trustee

15   only indicates that rental rates have gone down in the last couple of years and vacancy rates have

16   increased.

17       It is also worth repeating, now that this Court is being called upon to approve the sale of the

18   Property, that from the first day the Committees met with the Trustee, the very first thing they asked

19   him was "Please don't sell the Wilshire Bundy Building". It is also worth emphasizing that the

20   Committees in this case are somewhat unique in that their individual members have more real estate

21   experience, particularly in the development of commercial property in West Los Angeles where the

22   Property is located, than the Trustee. This is not meant as a slight to the Trustee who the Committees

23   respect for his expertise in forensic accounting. But the decision on whether or not the sell the

24   Property does not require an expertise in forensic accounting. It requires real world experience in the

25   development, leasing and sale of commercial real estate, particularly in West Los Angeles, which the

26   Committee members have. Given the breadth of experience that the Committees have in this

27   particular area, they believed that their input should be of value to the Trustee. Apparently the Trustee

28   believes otherwise and has refused to listen to the Committees or the creditors. If for no other reason

1    than the Trustee is gambling with the creditors money without their consent, this Motion should be

2    denied.  In addition to the plea of the creditors to listen to their request that the Property be held, there

3    are economic reasons why the Property should not be sold, along with the "will of the creditors".  As

4    discussed in great detail in the Declaration of M. Freddie Reiss of FTI, the Namco Committee's

5    financial consultant, market forces dictate that this could be one of the worst times to sell the Property.

6    Unlike the Motion which fails to provide competent support for the Trustee's contention that now is

7    the appropriate time to sell the Property, the Committee's present this Court with expert testimony

8

9    through the Declaration of Mr. Reiss supported by market research and data, all of which make it

10   abundantly clear that the Property should be held and not sold at this time.

**II.**

**<u>ARGUMENT</u>**

11

12

13   **A.**    **THIS COURT DOES NOT HAVE JURISDICTION TO HEAR THE MOTION**

14          At the hearing on the Procedures Motion, this Court properly raised the question of whether or

15   not it had the authority to hear a motion relating to the sale of the Property because the moving party,

16   the Trustee, did not have any ownership interest in the Property.  The Trustee conceded that the

17   Property is not an asset of this Estate which gave pause to this Court in going forward with the

18   Procedures Motion based on the unassailable fact that this Court did not have jurisdiction to hear the

19   proceeding.  In response, counsel for the Trustee advised this Court that two of the eight special

20   purpose entities ("SPE's") that owned the land and building had filed chapter 11 petitions that

21   morning and a third would be filing later that day.  The Trustee further represented that these two

22   SPE's were consenting to the sale.  Based on these representations, the Court went forward and heard

23   the Procedures Motion, but still expressed reservation over the question of jurisdiction, and rightfully

24   so.

25          While these three SPE's did file bankruptcy petitions on the day of the Procedures Motion, the

26   Committee disputes the contention that the filings give this Court jurisdiction to go forward with the

27   Sale Motion.

28

CREIM, MACIAS, KOENIG & FREY LLP
611 WEST SIXTH STREET 14TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 614-1944

1.     Bad Faith Bankruptcy Filings by the SPE's

It was clear from the hearing on the Procedures Motion that the deciding factor in allowing the Trustee to go forward with the sale of the Property was the bankruptcy filings of three SPE's, namely Bundy Dimes, LLC, Mission Real LLC and Bunwil Capital LLC (collectively the "Interest Holders"). Because this Court rightfully concluded that the Trustee did not have any ownership interest in the Property, without the joinder of the Interest Holders in the sale of the Property, the sale could not proceed. Anticipating this road block, the Trustee apparently directed three solvent entities, the Interest Holders, to file for bankruptcy protection, for no reason other than to give the Trustee the ability to argue that the Court did in fact have jurisdiction to hear the Motion. Circumventing the will of the creditors is not a proper purpose for filing chapter 11, which is exactly what the Trustee did when he directed the Interest Holders to file their Bankruptcy Petitions.

Each of the three Interest Holders were arguably solvent at the time of their filing. Bankruptcy Code §101(32) defines "insolvent" as:

(A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, ..."

Although an analysis of the Interest Holders' financial condition has not been undertaken, a review of each of their schedules reveals that their assets exceeded their liabilities on each of their petition dates. Mission Real LLC's schedules [Docket No. 60][1] shows assets of $102,484,985 and liabilities of $93,302,855. Bundy Dimes LLC's schedules [Docket No. 37] show assets of $99,552,287 and liabilities of $44,320,063 and Bunwill Capital LLC's schedules [Docket No. 44] reveal that its assets have a value of $99,555,320 and have liabilities of $92,949,428. It is also interesting to note that in these three cases, the bankruptcy counsel for each of the Interest Holders, Danning, Gill, Diamond & Kollitz, LLP, ("DGDK") the same counsel as the Trustee's, did not receive any compensation for their representation. See, Disclosure of Compensation filed in each case of the three cases [Docket No's. 58, 39 and 44 respectively].

---

[1] The Docket Number refers to the Docket in the Bankruptcy Case of the referenced Interest Holder.

CREIM, MACIAS, KOENIG & FREY LLP
611 WEST SIXTH STREET, 16TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 614-1944

In considering the question of whether or not a bankruptcy filing was in good faith, courts have looked skeptically at those entities that appear to be financially sound.  In In re Liberate Technologies, 314 B.R. 206, 211, 212 (Bkrty. N.D. Cal 2004), the court found:

> The most conspicuous element of the good faith requirement is that the debtor needs Chapter 11 relief. 'Courts, therefore, have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11. [citations omitted]. Those courts have recognized that if a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed." SGL Carbon, supra, 200 F.3d at 166.

> Where the debtor is insolvent, a petition will almost invariably be consistent with the objectives of the bankruptcy laws. The filing of a petition implements Congress's scheme of debt priorities and the policy of equal distribution among creditors with the same priority.  Where the debtor is solvent, however, the only bankruptcy policy implicated is the avoidance of piecemeal liquidation that destroys the going concern value of an enterprise. The cases Debtor cites for the proposition that a solvent debtor may seek chapter 11 protection rely upon the policy of avoiding value-destroying liquidation.

> [T]he key aim of Chapter 11 of the Code ... [is] avoidance of liquidation. The drafters of the Code announced this goal, declaring that reorganization is more efficient than liquidation because 'assets that are used for production in the industry for which they are designed are more valuable than those same assets sold for scrap.' In re Johns-Manville Corporation, 36 B.R. 727, 736 (Bankr.S.D.N.Y.1984)

In a case decided by the Ninth Circuit, In re Marsch, 36 F.3d 825, 828 (9th Cir. 1994), the Ninth Circuit upheld the decision of the Bankruptcy Court to dismiss the bankruptcy case as a bad faith filing:

> Pursuant to 11 U.S.C. §1112(b), courts have dismissed cases filed for a variety of tactical reasons unrelated to reorganization.  While the case law refers to these dismissals as dismissals for 'bad faith' filing, it is probably more accurate in light of the precise language of section 1112(b) to call them dismissals 'for cause'.

Although the Committees are not seeking the dismissal of the bankruptcy cases filed by the Interest Holders, they do request that this Court consider the elements of a dismissal motion in its consideration of what the Trustee is trying to accomplish.  Recognizing that he did not have the ability to sell the Property because he didn't own it, the Trustee has instead used his authority to force three solvent entities into bankruptcy for no apparent reason other than to accomplish what he could not

1    otherwise do because of requirements of 11 U.S.C. §363(h), i.e., force the sale of the Property. This

2    Court should not validate the Trustee's abuse of his powers in such a manner.

3           2.    Did The Trustee Have The Authority To Put The Interest Holders Into

4                Bankruptcy?

5          According to the Motion, Section E, at page 10, the ownership structure of each of the

6    Interest holders is as follows:

7

8          (1)    Bundy Dimes LLC: its sole member is Dimes LLC, which is in its own chapter

9    7 proceeding as a result of the filing of an involuntary petition against it. No order for relief has been

10   filed in that case and no trustee has been appointed. The Namvar Estate owns a 50% membership

11   interest in Dimes and three of Ezri Namvar's children own the remaining 50% of Dimes. The

12   Committee's are informed and believe that Namvar is the custodian for his three children. There is no

13   indication in the Motion that Namvar or his children consented to the bankruptcy filing of Bundy

14   Dimes and there is no indication in the Motion that the Trustee had the authority, through the

15   operating agreement of Bundy Dimes or of Dimes, to put Bundy Dimes into a bankruptcy with the

16   consent of the other members.

17

18         (2)    Bunwil Capital LLC. Bunwil Capital is owned 100% by WN Birdview, LLC,

19   which is turn, is owned 100% by Dimes. As discussed above, there is no reference in the Motion that

20   Dimes or any of its members or interest holders consented to the bankruptcy filing of Bunwil Capital.

21

22         (3)    Mission Real Associates LLC The Namvar Estate owns a 92.5% interest in

23   Mission Real. Homayon "Tony" Namvar owns the remaining 7.5%. There is no statement in the

24   Motion discussing the operating agreement of Mission Real and whether or not it requires unanimous

25   consent to put Mission Real into bankruptcy.

26

27

28

CREIM, MACIAS, KOENIG & FREY LLP
611 WEST SIXTH STREET 16TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 614-1944

3. <u>The Motion Fails to Provide Any Evidence That The Interest Holders Will
Benefit from the Sale</u>

The Motion does not address the impact of the sale of the Property on the Interest Holders. The Motion does discuss that two of the Interest Holders, Bundy Dimes LLC and Mission Real LLC, have filed adversary proceedings against the other non-debtor Property Owners[2] under Section 363(h) of the Bankruptcy Code to force the sale over their apparent objections or, at a minimum, their unwillingness to consent to the filing bankruptcy. Embroiling two of the Interest Holders in litigation, with no indication how they will pay the legal fees, and then dragging the non-consenting Property Owners into litigation just so the Trustee can accomplish his goal of selling the Property does not appear to provide any benefit to the Interest Holders.

The lack of a benefit to the Interest Holders is made clear in Section M (page 18) of the Motion entitled "Disbursement of the Proceeds of the Sale". Under the terms of the Sale Agreement, the proceeds from the sale of the Property are to be distributed to the Trustee in a segregated account and disbursed as ordered by this Court. There is no evidence presented that the Interest Holders will receive any of the sale proceeds.

Interestingly, the sale of the Property does not provide any immediate benefit to the Namvar Estate either. According to the Motion, the agreement between the Trustee, the Interest Holders and the non-debtor Property Owners provides that the sale proceeds are to be deposited into a segregated account and not to be distributed to any of the parties until there is an order from this Court providing how the funds are to be distributed. In addition to the Trustee, the Interest Holders and the non-debtor Property Owners, the Committees are informed and believe that there are other third parties that have asserted claims against any sale proceeds of the Property. Until the rights of all

---

[2] The capitalized terms not otherwise defined herein have the same definition as set forth in the Motion.

CREIM, MACIAS, KOENIG & FREY LLP
411 WEST SIXTH STREET 6TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 614-1944

parties asserting a claim against the proceeds from the sale of the Property have been adjudicated, there is no certainty that the Namvar Estate or the Interest Holders will benefit from the sale and therefore the sale at this time is premature.  Not only is Trustee attempting to sell the "crown jewel" of the portfolio in a distressed real estate market, but he will tie up the proceeds for an unknown period of time in a segregated account accumulating little or no interest, while at the same time the Property could very well be increasing in value as the commercial real estate market rebounds.  At this early stage of the bankruptcy cases of the Interest Holders a creditors committee has not yet been formed and it is unlikely that the creditors of these debtor's have had an opportunity to review and analyze the impact of the sale of the only significant asset of these Estates.  This raises the question, who is really looking out for the interests of the creditors of the Interest Holders?  The position that the Trustee has put the Interest Holders in is certainly not in the best interests of the creditors of these Estates and should not be approved by this Court.

**B.    THE REQUIREMENTS OF 11 U.S.C. §363(H) HAVE NOT BEEN MET**

The Motion fails to provide this Court with admissible evidence to support how the Trustee can meet the requirements of Bankruptcy Code §363(h), and therefore the Motion should be denied. While it is recognized that there are four conditions that a trustee is required to satisfy before he can force the sale of the interests of tenants in common, in this case, the Trustee cannot even satisfy the predicate to subjection (h).  Subsection (h) of Section 363 provides that a trustee:

> may sell both the estate's interest ... and the interest of any co-owner of the property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, join tenant or tenant by the entirety
> ...

In the case at hand, the Estate does not have an interest to sell!  Put more accurately, the Trustee is attempting to sell the assets of three other bankruptcy estates, as well as the interests of its co-owners.  For the reasons discussed above, this Court should not allow the Trustee to circumvent Bankruptcy Code §363(h) through what amounts to bad faith filings and should deny this Motion.

1    Assuming that the Court is able to over look the question of whether or not the Interest Holders

2    bankruptcies were filed in good faith or not, because the Motion fails to present admissible evidence

3    that satisfies the conditions of Bankruptcy Code §363(h), the Motion should be denied. Subsection (h)

4    allows a trustee to sell the interests of a co-owner in property only if:

5
6    (1)    partition in kind of such property among the estate and such co-owners is
    impracticable;

7
8    (2)    sale of the estate's undivided interest in such property would realize

9    significantly less for the estate than sale of such property free of the interests of such co-owners;

10
11    (3)    the benefit to the estate of a sale of such property free of the interests of co-
    owners outweighs the detriment, if any, to such co-owners; and

12
13    (4)    such property is not used in the production, transmission, or distribution, for

14    sale, of electric energy or of natural or synthetic gas for heat, light, or power.

15    The Trustee has the burden of establishing that he has satisfied each of the four elements of

16    Section 363(h). Specifically, the Trustee must prove, through admissible evidence, that partition is

17    impracticable, that a sale of the estate's undivided interest (in this case keeping in mind that the

18    Namvar Estate does not hold an interest) would realize significantly less for the estate then the sale of

19    the property free and clear of the interests of the non-debtor Property Owners, and finally that the

20    benefit to the estate of such sale outweighs the detriment to the non-debtor Property Owners. See, In

21    re Roswick 231 B.R. 843,858-859 (Bkrtcy S.D. N.Y. 1999).

22
23    The only effort the Trustee makes to satisfy this burden is the unsupported statement found at

    paragraph 12 of his declaration, in which he says: "It would be impractical for the Sellers to seek to
24
    sell the Debtors' interests in the Property separate from the interests of the Sellers and any buyer
25
    would pay substantially less for a fractional interest in the Property."    This does not meet the burden
26
    imposed by Section 363(h) as it fails to present any evidence to support the statements it makes. In
27
    fact, the only cases cited by the Trustee on this point deal with residential real property and not a
28

1    commercial building.    The Trustee provides absolutely no authority to support his contention that the

2    it would be impractical to partition the interests of this particular Property. . It is mere conjecture by

3    the Trustee without any explanation of what he bases his conclusions on and what expertise he has to

4    render such an opinion.

5          Assuming that this Court were to determine that this simple statement satisfies the Trustee's

6    burden for the first two elements of the test, because the Trustee completely disregards the third

7    element, whether or not the benefit to the Estate outweighs the detriment to the non-debtor Property

8    Owners, this Court must find that the Trustee has failed to meet his burden under Section 363(h).

9

10         Instead of addressing the requirements of Section 363(h), the Trustee presents two arguments

11   in support of the Motion.  First, he argues that   based on the fact that all of the non-debtor Property

12   Owners signed a listing agreement with Madison Partners to list the Property for sale, they have

13   "consented" to the Motion.  Because words have meaning and influence the reader, it is important to

14   note the specific words the Motion uses to define the listing agreement.  The document that the non-

15   debtor Property Owners signed is entitled "Agreement re Leasing and Sale of Property and Addendum

16   to Exclusive Right Listing Agreement and Exclusive Right Listing Agreement-Sale"  See, Motion at

17   pages 17, line 26 and page 18 line 1.  The capitalized term that the Motion chooses to define this

18   document is "Sale Agreement".  This document is not a sale agreement; it is an agreement to list the

19   Property for sale and so is more accurately called a listing agreement.   By calling it a "Sale

20   Agreement", the Trustee is trying to influence this Court by arguing that the non-debtor Property

21   Owners have already agreed to the terms of the sale to the Proposed Purchaser.   While it may be

22   argued that by signing the listing agreement the non-debtor Property Owners consented to sell the

23   Property, it cannot be argued that they agreed to sell the Property under the specific terms and

24   conditions of the PSA, which is the true "Sale Agreement".

25         The second argument the Trustee presents regarding the requirements of Section 363(h), is that

26   "out of an abundance of caution", Bundy Dimes and Mission Real have filed adversary proceedings

27   against the non-Debtor Property Owners to force the sale of their interests in the Property.  As of the

28

CREIM, MACIAS, KOENIG & FREY LLP
401 WEST SIXTH STREET, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 614-1944

filing of this Opposition, the outcome of those adversary proceedings are unknown, nor is it known whether or not any of the non-Debtor Property Owners have the financial ability to defend their interests against Bundy Dime, Mission Real and the Trustee.

Moreover, motions for summary judgment in the adversary proceedings commenced by the on Interest Holders on the issue of 363(h) have been filed and those motions will be heard the same time as the hearing on this Motion. Only if those summary judgment motions are adjudicated in favor of the Interest Holders does the Trustee potentially have the ability to sell the Property. As such, it is premature to approve the Motion and sell the Property at this time.

In summary, because the Motion fails to address any of the conditions of 11 U.S.C.§363(h), the Motion should be denied.

## C.    THE PROPERTY SHOULD NOT BE SOLD IN A DISTRESSED REAL ESTATE MARKET

The Trustee postulates that this is the right time to sell the Property because a "risk exists that the Property could decline in value if left in the possession of the bankruptcy estate." See, Motion at page 13 lines 13-14. The Motion also argues that the price the Trustee was able to achieve for the Property represents a "scarcity premium", because there are so few Class A high rise office buildings on the market at this time. The Motion fails to provide this Court with any admissible evidence to support the Trustee's statements. Instead, the .Motion is replete with conjecture and unsubstantiated opinion from unqualified interested parties.

The timing of the sale is addressed in the Declaration of R. Todd Neilson in one brief two-sentence paragraph which references "all of the reasons and considerations discussed in the Declarations of Louis Cicalese and Bob Safai". The Declaration of Louis A. Cicalese, a Philadelphia based real estate professional, whose two page declaration contains no analysis of future trends and only an anecdotal summary of recent lease negotiations and a discussion of rent trends from 2006 through 2008. The Declaration of Bob Safai, a broker whose firm stands to earn approximately $1 million from this transaction, it is approved by this Court, states that: "Although non one can predict

the future", it is his opinion that the Property should be sold now based on a spurious assertion that there is currently a "scarcity premium" for Class A high rise office buildings. In any event, Mr. Safai is not disinterested and his declaration cannot be relied upon for this weighty decision.

In stark contrast to these declarations, the Committees submit the declaration of M. Freddie Reiss ("Reiss Declaration")[3]. In his declaration Mr. Reiss provides this Court with expert opinion supporting the Committees' position that the Property should not be sold at this time.

1.    Possibility Of A Decline In Value Of The Property

The Committees do not dispute that there is a possibility that the Property could decline in value. The Committees also agree that no one can predict the future with 100% accuracy. Acknowledging these possibilities, it also must be acknowledged that both the Committees and the Trustee must use some form of metrics to value the Property today, make some assumptions about the future and determine whether or not this is the right time to sell the Property. It is easy to argue that a prediction about future market performance may not be accurate, but it must also be agreed that so long as the conclusions are based on sound reasoning and valid numbers, the argument must be given due consideration . However, when the argument is based on anecdotal "evidence" and supposition, the argument must be rejected. That is the situation with which this Court is presented. Through the Reiss Declaration, the Committees have presented this Court with sound, reasoned argument in support of its contention that now is not the right time to sell the Property. Put simply, to sell now would fly in the face of the old adage, buy low, sell high.

The Reiss Declaration provides this Court with admissible evidence in support of the argument that the real estate market for commercial office buildings, especially those in the submarket of Brentwood where the Property is located, is at or near the bottom, with the expectation of a rise in

---

[3]  Because the Reiss Declaration contains references to confidential material provided to Mr. Reiss and the Committees by the Trustee based on a confidentiality agreement executed by the parties, the Reiss Declaration and Exhibits thereto have been filed with the Court under seal.

CREIM, MACIAS, KOENIG & FREY LLP
611 WEST SIXTH STREET 16TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 614-1944

values by the third or forth quarter of 2011. Because the Property is not in danger of foreclosure, there is no viable reason to sell at this point in the market.

>    2.    There Is No "Scarcity Premium"

The Motion is somewhat contradictory in the arguments that it presents in support of the timing of the sale. First, the Motion argues, without any real support, that as a result of the sluggish economy, commercial office vacancy rates have increased and there is no indication that this trend will reverse itself in the near future (Motion at page 12, lines 2-9). Despite this uncertainty, the Motion also explains that the Trustee was able to generate such favorable offers for the Property because of what they call a "scarcity premium" of Class A high rise office buildings. However, as the Reiss Declaration explains, there is no scarcity premium. Instead, what the market shows is that the owners of the Class A high rise office buildings in Brentwood realize that this is an inopportune time to sell and are therefore holding there properties out of the market.

The Reiss Declaration argues, with supportable, admissible evidence, that there are over 1,000 Class A commercial office buildings in Los Angeles, with approximately 20 in Brentwood alone. As Mr. Reiss explains, it is not that there is a scarcity of available commercial office buildings. Instead, what this demonstrates is that the owners of these other buildings do not believe that this is an appropriate time to sell and therefore are holding on to their assets until market conditions improve, which they are bound to do. The Motion contains absolutely no evidence to support the Trustee's assertion that there is a "scarcity premium", and no evidence that if there is such a thing, that the so called premium will not exist in the future. The Reiss Declaration, in contrast, discusses the fact that due to restrictions on new building construction in West Los Angeles, the Property will enjoy a unique position in that market.

While the Reiss Declaration provides this Court with empirical data to support its conclusion that the timing of the sale of the Property is not in the best interests of the creditors, the Motion relies on conjecture and supposition from parties with a financial stake in the sale. The Committees, on the other hand, are looking out for the best interests of the unsecured creditors of the Namco and Namvar

1    Estates, and with that, and only that in mind, implore this Court to deny the Motion and prevent the

2    sale from going forward.

3              3.        The Property Can Sustain Itself

4              Nowhere in the Motion does the Trustee provide this Court with any support for the

5    Trustee's contention that the Property does not have sufficient cash flow to meet its financial

6    obligations.    Instead of certainty, the Motion uses the language of speculation when discussing

7    whether or not the Property generates the necessary cash flow to pay its expenses. At page 13, lines 1-

8    3, the Motion states: "In fact, the ability of the Property to generate sufficient revenues on a stand

9    alone basis to meet its obligations during the pendency of the Namvar chapter 11 case thus far has

10   been uncertain." This exact phrase is repeated in the declaration of Louis A. Cicalese, the real estate

11   consultant to the Trustee.    Based on the information provided to the Namco Committee's financial

12   consultants, the Reiss Declaration challenges the accuracy of this concern.

13

14             According to the analysis performed by Mr. Reiss, the Property may experience a

15   negative cash flow from April through December 2010.  However, it must also be pointed out that the

16   Trustee has available to him the ability to access funds to make up this short fall, on an interest free

17   basis.  Based on information provided to Mr. Reiss and his colleagues at FTI by Mr. Cicalese, and

18   confirmed by counsel for the Trustee, there is an agreement between, among others, the Trustee and

19   the former owners of the Angeleno Hotel, that the Trustee can use a portion of the proceeds from the

20   sale of the Angeleno Hotel, interest free, to meet any of the operating expenses of the Property that are

21   not satisfied from the cash flow generated by the Property itself.  This source of funds will allow the

22   Trustee to avoid any defaults on the financial obligations of the Property, as the real estate market

23   recovers.  As explained in the Motion, the Property has significant equity value in excess of its debt.

24   Given the amount of equity in the Property, the Trustee should be able to determine how to manage

25   the Property to positive cash flow, to arrange for the Property's management in the context of a plan of

26   reorganization, or to arrange sufficient financing to the extent the Trustee determines necessary for

27   2011.

28

CREIM, MACIAS, KOENIG & FREY LLP
611 WEST SIXTH STREET, 16TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 614-1944

**D.     THE PROPERTY SHOULD NOT BE SOLD WITHOUT A CLEAR "PLAN" FOR THE DISPOSITION OF THE ASSETS OF THESE ESTATES**

The Namvar and Namco cases have been pending before this Court since January of 2009.  In March of 2009, the order approving the appointment of the Trustee was entered by this Court.  Despite the fact that the Trustee was appointed over 13 months ago, the creditors still have no clear understanding of the assets  the Namvar or Namco Estates own, what interests they hold in various LLC's, or the value of any of the interests the Estates hold.  This Court has seen a parade of motions filed by the two Trustees to sell, compromise or restructure the interests that the Namco and Namvar Estates hold, without any indication that the Trustees have a plan in mind for the restructure or liquidation of these Estates.  It appears to the Committees, and to the creditors of these Estates, that the Trustees are selling off properties or interests for no other reason then to generate cash, without any real strategy or plan in mind.  Given the fact that the Trustees do not yet know, or have not communicated, just what assets these Estates hold, their interests in these assets, and the liens against such assets, such a plan or strategy would be impossible to formulate.  However, without a "Plan" or structure in place, the Committees believe that the Trustees should be prevented from selling the Property.  The Committees have tried to convince the Trustees to hold on to their interests until a Plan can be developed, but to no avail.  It seems only this Court can stop the Trustee's efforts and buy the Committees time to work with the Trustees in devising an exit strategy for these cases.

**III.**

**CONCLUSION**

It should be abundantly clear from the hundreds of declarations that have been submitted in support of this Opposition, the entire creditor body of both the Namco and Namvar Estates are opposed to the sale of the Property.  As is evidenced by the Declaration of M. Freddie Reiss, their opposition is not based on misplaced sentiment or emotion, it is based on sound business judgment. The market for commercial office buildings of this unique nature is at or near the bottom.  There are no market forces compelling a sale at this inopportune time.  The building is not in default, it is not declining in value and the Estate's have sufficient funds to sustain its operations until the market

1   recovers.  For all economic reasons, and more importantly in response to the will of the creditors, the

2   sale of Wilshire Bundy should not be approved.

3   Dated: April 29, 2010                          CREIM MACIAS KOENIG & FREY LLP

4

5                                                  By:___/s/ Stuart I. Koenig_____

6                                                      STUART I. KOENIG
                                                   Attorneys for the Official Committee of Unsecured
7                                                  Creditors of Namco Capital Group, Inc.

8

9                                                  SHULMAN HODGES & BASTIAN LLP

10

11                                                 By:___/s/ Melissa R. Davis_____
                                                       MELISSA R. DAVIS
12                                                 Attorneys for the Official Committee of Unsecured
                                                   Creditors of Ezri Namvar

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CREIM, MACIAS, KOENIG & FREY LLP
601 WEST SIXTH STREET 16TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 614-1944

| In re:  Mission Real Associates, LLC, | CHAPTER 11 |
| | |
| Debtor(s). | CASE NUMBER  2:10-bk-22370-BR |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

Creim Macias Koenig & Frey, LLP, 633 W. Fifth Street, 51st Floor, Los Angeles, CA  90071

The foregoing document described <u>JOINT OPPOSITION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NAMCO CAPITAL GROUP AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF EZRI NAMVAR TO THE JOINT MOTION OF DEBTORS AND CHAPTER 11 TRUSTEE FOR ORDER (A) APPROVING THE SALE OF WILSHIRE BUNDY PLAZA FREE AND CLEAR OF CERTAIN LIENS, CLAIMS INTERESTS, AND ENCUMBRANCES; (B) AUTHORIZING DISTRIBUTION OF THE SALE PROCEEDS TO THE TRUSTEE; (C) AUTHORIZING THE TRUSTEE TO PAY CERTAIN COSTS OF SALE AND COMMISSION; (D) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES; AND (E) GRANTING RELATED RELIEF; [FILED SEPARATELY UNDER SEAL]</u> will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On <u>April 29, 2010</u> I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

| | |
|---|---|
| Russell Clementson | russell.clementson@usdoj.gov |
| Brian L. Davidoff | bdavidoff@rutterhobbs.com; calendar@rutterhobbs.com; jreinglass@rutterhobbs.com |
| Richard K. Diamond | rdiamond@dgdk.com |
| Jeffery D. Hermann | jhermann@orrick.com |
| James KT Hunter | jhunter@pszjlaw.com |
| Yale K. Kim | ykim@allenmatkins.com |
| Stuart I. Koenig | skoenig@cmkllp.com |
| Jeffrey A Krieger | jkrieger@ggfirm.com |
| Scotta McFarland | smcfarland@pszjlaw.com |
| Hal M. Mersel | mark.mersel@bryancave.com |
| Walter K. Oetzell | woetzell@dgdk.com |
| Malhar S. Pagay | mpagay@pszjlaw.com |
| Leo D. Plotkin | lplotkin@lsl-la.com; dsmall@lsl-la.com |
| David M. Poitras | dpoitras@jmbm.com |
| Christopher S. Reeder | creeder@reederlugreen.com |
| Steven J. Schwartz | sschwartz@dgdk.com |
| U.S. Trustee (L.A.) | ustpregion16.la.ecf@usdoj.gov |

☒  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On <u>April 29, 2010</u> I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

The Hon. Barry Russell (By U.S. Mail)
U.S. Bankruptcy Court
Roybal Federal Building
255 E. Temple St. Bin outside of Suite 1660
Los Angeles, CA  90012-3332          ☒          Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                    **F 9013-3.1**

| In re:  Mission Real Associates, LLC, | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER  2:10-bk-22370-BR |

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on April 29, 2010 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 29, 2010 | Kelli Nielsen | |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

**II.  SERVED BY U.S. MAIL**

Harvey R. Friedman
1900 Avenue of the Stars, 21st Fl.
Los Angeles, CA  90067-4590

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                    **F 9013-3.1**